816 F.2d 679
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellant,
Cross-Appellee,
v.
P. Douglas MORRISON; Randy Tyree; Tennesseans for Tyree;
George Dukas and Justine Dukas,
Defendants-Appellees, Cross-Appellants.
 Nos. 85-5272, 85-5273.
 United States Court of Appeals, Sixth Circuit.
 April 14, 1987.
 
 Before ENGEL and GUY, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This case involves two separate appeals arising from the same core of operative facts, i.e., the execution of a promissory note for the purpose of raising funds for the campaign of then-gubernatorial candidate Randy Tyree, and a subsequent execution of a guaranty for such loans. For the following reasons, the trial court's grant of summary judgment in favor of Randy Tyree and P. Douglas Morrison is reversed, while its grant of summary judgment against the Dukases is affirmed.
 
 I.
 Factual and Procedural History
 
 2
 The Federal Deposit Insurance Corporation (FDIC) purchased certain assets in its corporate capacity, pursuant to 12 U.S.C. Sec. 1823(c)(2)(A), from the receiver of the failed United American Bank in Hamilton County, Tennessee (Bank). Among those assets was an interest-bearing promissory note dated September 20, 1982, in the amount of $378,750.00, specifying repayment on demand and, if no demand was made, within ninety days after execution of the note. The note was executed "Tennesseans for Tyree by P. Douglas Morrison, Chairman," Tennesseans for Tyree being an unincorporated association. The note was executed during Randy Tyree's gubernatorial campaign in 1982 and was for the purpose of obtaining financing for that campaign.
 
 
 3
 Apparently also within the Bank's files was a document entitled "Continuing Guaranty" on a form printed for the United American Bank in Knoxville, Knoxville, Tennessee. The words "Knoxville, Knoxville" in the lender's name have been lined out and "Hamilton County" has been substituted. The Guaranty is dated November 15, 1982, and is signed by defendants George E. Dukas and Justine M. Dukas. It guarantees all debts of the Tennesseans for Tyree "now existing or hereafter arising" up to a total of "unlimited" dollars.
 
 
 4
 Since the note was in default, the FDIC brought suit against the Tennesseans for Tyree, Randy Tyree, and P. Douglas Morrison on the note, as well as George and Justine Dukas on their guaranty. The trial court granted summary judgment on the note in favor of Tennesseans for Tyree, Randy Tyree and P. Douglas Morrison upon the following findings:
 
 
 5
 a) although probably no longer in existence, Tennesseans for Tyree was a "political campaign committee" within the meaning of Tenn.Code Ann. Sec. 2-10-102(10)(C);[1]
 
 
 6
 b) defendant Morrison signed the note on behalf of the committee as an agent for a disclosed, then-existing principal;
 
 
 7
 c) as a general rule, members of an unincorporated association are not personally responsible for the association's contracts made without authority and in the absence of ratification or other evidence of assent; and
 
 
 8
 d) there was no evidence in the record to indicate any intent to be personally bound or that the bank intended committee members to be personally liable.
 
 
 9
 Although the district judge also held that the Dukases were not liable on the note as members of the political campaign committee, he subsequently entered summary judgment against them on the question of their liability on their guaranty. In so ruling, the court noted that their testimony to the effect that they signed the form knowing only that it was a "fund-raising thing for Randy," that they never read the form or questioned its import or possible use, that they were not concerned that the form contained blank spaces and never questioned how they would be filled in nor gave any instructions about their content. This led the court to conclude that "in recklessly signing a continuing guaranty to assist in raising funds for their son-in-law, Randy Tyree, Mr. and Mrs. Dukas 'lent themselves to a scheme likely to deceive banking authorities,' see D'Oench, Duhme and Co. v. Federal Deposit Insurance Corp., 315 U.S. 447 (1942)." He further found that their defenses of fraud in the inducement and failure of consideration were barred under federal case law.
 
 
 10
 The FDIC here appeals the ruling in favor of Randy Tyree and P. Douglas Morrison, while the Dukases appeal the ruling in favor of the FDIC on the guaranty. We address these appeals seriatim.
 
 II.
 
 11
 The FDIC's Appeal Against Tyree and Morrison
 
 
 12
 We reverse the grant of summary judgment in favor of Tyree and Morrison because we find there were disputed questions of fact which cannot be resolved without trial. Tennessee law provides that the liability of members of an unincorporated association of a social or political nature shall be determined on the principles of agency. Blair v. Southern Clay Mfg. Co., 173 Tenn. 571, 121 S.W.2d 570 (1938). At the outset, it is questionable whether "Tennesseans for Tyree" even qualifies as a bona fide political association. Deposition testimony of both Tyree and Morrison raise substantial questions as to the lack of any organizational structure, the true membership of the group, the regularity of its meetings, or the existence of any charter or by-laws. Tyree stated at various points that the group was composed of only three individuals, C.H. and Jake Butcher, and Jesse Barr,[2] and, conversely, that the group could conceivably be deemed, in a larger sense, to include everyone who had voted for him in the election. Tyree further testified that the sole purpose of the group was to obtain loans to finance his campaign and that, although he was not a "member" of the group, he was involved in several meetings with Barr and the Butchers concerning the means of financing his campaign expenditures. Morrison also testified that he had never been a member of the organization, despite the fact that he signed several promissory notes in the capacity of "Chairman" of the association. Tyree further testified that the name Tennesseans for Tyree was initially selected simply for the purpose of disclosure under the state's campaign disclosure laws and that neither the Butchers nor Barr ever expressly stated that they considered themselves members of such an organization.
 
 
 13
 On the basis of such nebulous contradictory testimony, a fact question arises as to whether this organization was ever sufficiently organized to qualify for treatment under the agency principles applicable to unincorporated political associations.[3] Even if the organization qualifies as a political association, such a determination does not shield from liability members who contract on behalf of the association with authority or who knowingly accept the benefits of the contract. See Rich Printing Co. v. Estate of Kenneth Douglas McKellar, 46 Tenn.App. 444, 330 S.W.2d 361 (1959) (estate of deceased senator liable on contract for printing services on grounds of ratification, i.e., knowledge that services were being rendered for benefit of his campaign). Although Morrison testified that he was not a member of the association, he referred to himself at various times as Tyree's fund raising chairman and, in one transaction where he questioned the necessity for his signature, he stated that Tyree instructed him to sign the note as Jesse Barr directed, and assured him that he would incur no personal liability by doing so.[4] Also, when Tyree was asked whether Morrison was a member of Tennesseans for Tyree, he stated, "I don't know. It depends on how you define Tennesseans for Tyree." The evidence of record is sufficient to raise factual questions as to the existence of the association and its membership, as well as potential ratification of the contract by Tyree in his undisputed acceptance of the funds and expenditure of them in satisfaction of campaign debts.
 
 III.
 The Dukases' Appeal Against the FDIC
 
 14
 The Dukases argue that the court erred in applying the rationale of D'Oench to bar certain of their defenses on the grounds that they never dealt directly with the Bank and that the guaranty they executed was facially invalid due to the interlineation and substitution of "Hamilton County" as the named bank. They further contend that, since the trial judge did not specifically address each one of their asserted defenses, that some of those defenses were viable and raised questions of fact. The Dukases raised the following defenses before the trial court and on appeal: discharge by material alteration, failure of consideration, lack of mutual assent, fraud in the inducement, lack of effective delivery, and estoppel. Based on the circumstances surrounding the execution of this guaranty, we find summary judgment for the FDIC appropriate.
 
 
 15
 In her deposition, Mrs. Dukas testified that someone from Randy Tyree's campaign headquarters telephoned her and requested that she sign something for a fundraiser for Tyree. She further testified that she and her husband had previously attended as many of Tyree's fund-raising events as possible and had donated money to his campaign on more than one occasion, although they had never before been asked to sign any document in connection with fund raising. She stated that, upon her receipt of the blank Continuing Guaranty form, she signed it without "really reading it" and then took it home for Mr. Dukas's signature. Mr. Dukas likewise testified that he did not read the document prior to signing it. The next day, someone from Tyree's campaign headquarters picked up the form from the Dukases, still containing the blank spaces.[5]
 
 
 16
 The Dukases acknowledged that they signed the form in blank for the purpose of raising funds for Randy Tyree, that the signatures on the Continuing Guaranty are their signatures, and that they did not read the document nor acquaint themselves with its contents before they executed it in blank.[6] Although the Continuing Guaranty form itself is not commercial paper in that it does not possess the requisites of negotiability, neither does it render the Dukases merely accommodation parties to the original, pre-existing note. Instead, it constitutes a separate contract between the Bank and the Dukases. Villines v. Parham-Lindsey Grocery Co., 6 Tenn.App. 254, 261 (1927). The Dukases attempt to negate the very existence of that contract by their claim of lack of mutual assent, i.e., it was never their intent to guarantee any loans to the Hamilton County Bank on behalf of Randy Tyree. However, intent is ascertained by one's acts and not whether one intended the consequences of those acts. Whittier, The Restatement of Contracts and Mutual Assent, 17 Calif.L.Rev. 441, 447-48 (1929). The Tennessee courts have discussed the question of mutuality of intent in a similar case involving the execution of a guaranty by a third party. In Third National Bank in Nashville v. Friend, 626 S.W.2d 464 (Tenn.App.1981), the defendant had signed a guaranty without reading it at the request of her husband. Upon subsequent suit, Mrs. Friend raised the defense of lack of mutual assent. The court, in discussing her execution of the guaranty, stated:
 
 
 17
 The finding that Mrs. Friend did not actually intend to bind herself in any future obligation does not support a conclusion that such was not within the (legal) contemplation of the parties ... the act of Mrs. Friend in signing the guaranty is conclusive of her intent i.e., what was in her contemplation, unless she should show a mutual understanding on the part of both herself and the bank as to the effect of the instrument, or that she was fraudulently misled into signing the guaranty without reading it.... Mrs. Friend had no intent at all, for as she contends, she did not know at the time what she was signing. Her intent must be deduced from the unread contents of the paper she signed and that intent was the same as that of the bank....
 
 
 18
 626 S.W.2d at 466-67 (emphasis added). As in Friend, it is obvious that the Dukases had no intent with respect to the guaranty they signed since they had no knowledge of any of its terms. At most, it can be said that their intent in signing the form was to assist Randy Tyree in his campaign fund-raising efforts. Therefore, having manifested their assent to the guaranty's terms with their signatures, they cannot now avoid the consequences of their acts by claiming lack of mutual assent.
 
 
 19
 With respect to the Dukases' remaining defenses, we find the federal policy of protection of the FDIC in its capacity as a corporate insurer first enunciated in D'Oench, and as subsequently interpreted by this circuit, dispositive.[7] In D'Oench, the Supreme Court held that the maker of a note is estopped from asserting a failure of consideration defense against the FDIC if, in executing the note, he lends himself to a fraudulent transaction likely to mislead banking authorities. The court in D'Oench made clear that its holding was not predicated on the maker's knowledge of any fraudulent scheme or intent to deceive. 315 U.S. at 458-460 ("The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled.") (emphasis added). The Court explicitly stated that the maker would be liable even if he was ignorant of any scheme, as long as he was responsible for the creation of the note. Id. at 461. This court has construed D'Oench to preclude a maker from asserting any personal defenses against the FDIC, regardless of his intent, when it can be said that he "lent himself to a transaction which is likely to mislead banking authorities." FDIC v. Investors Associates X., Ltd., 775 F.2d 152, 154 (6th Cir.1985).[8] Therefore, it is not necessary for the Dukases to have known that their guaranty would be transmitted to the Hamilton County Bank to shore up the viability of the pre-existing note, a transaction which may be construed as a "fraudulent scheme." All that is required is that they "lent" themselves to the execution of an instrument which resulted in misleading the FDIC in valuing the assets of the failed Bank. Under federal common law, when the FDIC, as part of a purchase and assumption transaction, acquires a note in good faith, for value, and without actual knowledge of any defense against the note, it takes the note free of all defenses that would not prevail against a holder-in-due-course, i.e., all personal defenses. FDIC v. Wood, 758 F.2d 156, 161 (6th Cir.1985), cert. denied, 106 S.Ct. 308 (1986).[9]
 
 
 20
 Pointing out that the guaranty here sued upon does not qualify as a negotiable instrument, the Dukases urge this court to distinguish our prior holdings that federal common law governs the rights of the FDIC in assets it purchases in its corporate capacity, e.g., Wood, 758 F.2d 156; FDIC v. Armstrong, 784 F.2d 741, 744 (6th Cir.1986) (federal law controls, and state law will be incorporated only to the extent it does not conflict with federal policy), in cases involving such simple contracts. We reject this invitation since guaranties, by their nature, exist for the purpose of providing additional assurance that debts to which they relate are collectible. In this case, the Dukases' guaranty was a factor in inducing the FDIC, upon an examination of the Bank approximately six months prior to its insolvency, to upgrade the note from Tennesseeans for Tyree from a loss to a substandard rating. Such guarantees enhance the value of the Bank's commercial paper and, as a result, any acts by the maker of a guaranty which are likely to deceive the FDIC as to the value of the assets it purchases are indistinguishable in effect from those of the makers of the Bank's negotiable instruments. Therefore, it is appropriate to apply the same policies to makers of guarantees in favor of a Bank as to makers of promissory notes.
 
 
 21
 We find that the conduct of the Dukases in failing to question or even read the document submitted for their signature was so inherently reckless that they are precluded from asserting their claimed defenses based on the nature of that transaction, provided the FDIC acquired the guaranty without actual knowledge of defenses thereto.[10] See, e.g., FDIC v. Powers, 576 F.Supp. 1167, 1171 (N.D.Ill.1983), aff'd without opinion, 753 F.2d 1076 (7th Cir.1984) ("It is all the more appropriate to apply D'Oench to bar defenses arising from irregularities to which the defendant intentionally has contributed. Executing guaranties in blank is not good practice."); FDIC v. Hatmaker, 756 F.2d 34, 38 (6th Cir.1985) (signing of blank notes likely to mislead banking authorities). The Dukases contend that this case is identical to FDIC v. Meo, 505 F.2d 790 (9th Cir.1974), in which the court allowed the defense of failure of consideration against the FDIC. In that case, Meo had executed a promissory note to the Bank for the specific purpose of purchasing shares of the Bank's common stock. Without his knowledge, the Bank issued voting trust certificates instead. In allowing Meo to assert failure of consideration as a valid defense, the court specifically noted that he was "neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense...." Id. at 793 (emphasis added). Therefore, that case provides no support where, as here, the Dukases were not only negligent but recklessly indifferent to the consequences of their execution of the Continuing Guaranty.
 
 
 22
 Our final task is to ascertain whether the FDIC had actual knowledge of the Dukases' defenses, since the prerequisites of good faith and exchange of value are not disputed. The Dukases argue that the alteration of the guaranty to reflect the Hamilton County Bank rather than the Knoxville branch automatically rendered the document facially invalid so as to give rise to actual notice on the part of the FDIC.[11] It further appears from the record that an FDIC inspection of the Bank's accounts, conducted approximately six months prior to the Bank's failure, revealed the presence of the Continuing Guaranty form to one of the FDIC's open-bank division auditors. While the existence of "actual knowledge" will, in general, depend on the facts and circumstances surrounding each case and therefore is not susceptible of precise definition, we have held that the FDIC is under no duty to examine the assets of a failed bank before entering into a purchase and assumption transaction and, therefore, cannot be charged with knowledge "merely because that information could be found in the bank's files." FDIC v. Wood, 758 F.2d at 162 (citing Gilman v. FDIC, 660 F.2d 688 (6th Cir.1981)).[12]
 
 
 23
 We find that the interlineation and substitution of bank names on the guaranty form was not sufficient to render the document so irregular or remarkable as to give the FDIC notice of a potential defense of material alteration. This single fact is insufficient to overcome the FDIC's "presumption" of lack of knowledge, FDIC v. Armstrong, 784 F.2d at 745, especially in view of the fact that the auditor's report also contains information from a personal financial statement apparently elicited from the Dukases at the request of the Bank. Viewing the evidence in the light most favorable to the Dukases, see Fed.R.Civ.P. 56(c); SEC v. Blavin, 760 F.2d 706, 710 (6th Cir.1985) (per curiam), we find the district court's grant of summary judgment in favor of the FDIC appropriate.
 
 
 
 [1]
 That section specifies that:
 (10) "Political campaign committee" means:
 ....
 (C) Any committee, club, association or other group of persons which receives contributions or makes expenditures to support or oppose any candidate for public office or measure during a calendar quarter in an aggregate amount exceeding two hundred fifty dollars ($250).
 
 
 [2]
 The FDIC draws our attention to a related state case involving the identical parties to different notes with different guarantors, FDIC v. Tyree, 698 S.W.2d 353 (Tenn.App.1985). In that case, the court noted that it was stipulated by the parties that Jake Butcher was a Director and CEO of the United American Bank, and that the Butchers as well as Jesse Barr maintained offices in the Bank building. Although not dispositive in the case at abar, this court observes that the Tennessee appellate court found the existence of disputed issues of material fact whether Tyree and Morrison were members of Tennesseans for Tyree and whether they may be held to have ratified the contracts made in the association's name
 
 
 [3]
 If not, Morrison may be held personally liable on his signature on behalf of a non-existent principal
 
 
 [4]
 Morrison's deposition testimony with respect to this transaction was as follows:
 To the best of my memory the first phone call was to the extent that the bank needed this note signed and would I come down and sign the note. And I said I will call you back or something to that effect. And I then called Randy and asked him what was happening because it was my understanding that this association was going to take care of the financing, arranging the financing of the campaign. And I did not know that any of us would have to sign any notes.
 And Randy told me that he would check on it. I believe he said he'd check with Jake and get back to me. He did then get back to me and said that, yes, they had taken care of it but they wanted one of us to sign it as an agent for that association, and in doing so we would incur no personal liability.
 ...
 A. Very frankly, I probably assumed that since my primary function in the campaign was to help raise funds that it was in that capacity, that it would be natural for me to be the agent of them to sign this note.
 Q. All right. You had never done anything on behalf of or for Tennesseans for Tyree prior to the signing of this note, is that right?
 A. I'm not sure that that's correct.
 Q. Okay. What involvement did you have with the association prior to the signing of this note?
 A. I was helping to raise funds that--it was my understanding--that would go to the repayment of the loans arranged by these three people that I have mentioned.
 
 
 [5]
 The blank spaces in the form numbered three: one for the name of the party receiving credit from the lender, filled in with the name Tennesseans for Tyree; the second for the dollar amount, filled in with the word unlimited (however, the pre-printed portion of the form also states that "if no amount is herein set forth, then this Guaranty shall be unlimited."); and the third for the date, which is filled in as November 15, 1982, although Mrs. Dukas now states that she believes she signed the form sometime in October of 1982
 
 
 [6]
 The Dukases' testimony with respect to their signing the forms in blank was as follows:
 Q. Well did you have any understanding as to what, if anything might be filled in those blanks after you signed it?
 A. No.
 Q. Had anyone said anything to you prior to signing that document whether or not any information would be subsequently filled in?
 A. No.
 Q. Of course, you didn't object to signing the document in blank did you?
 A. No.
 Q. And there were blanks and printed material and your signatures and that's all?
 A. Yes.
 Q. When you turned the document over to the courier from the campaign headquarters, did you give him any special instructions or--
 A. No.
 Q. Alright, so you never specifically told anyone with the campaign not to fill in any of the blanks, is that correct?
 A. I had no reason to.
 Q. Alright, well, when you signed it in blank, were you concerned that somebody might fill in those blanks later on?
 A. I wasn't concerned with it.
 (Justine Dukas deposition).
 Q. Were you concerned about the fact that those blanks were not filled in?
 A. No sir.
 Q. Had you considered that sometime after you had signed and returned the document that those blanks might be filled in?
 A. No sir.
 Q. You had never been told by anyone had you that those blanks would not be filled in?
 A. No sir.
 Q. And you never specifically instructed anyone after you signed that document not to fill them in?
 A. No, sir.
 Q. Alright. What was your understanding as to why it was that you were being requested to sign it?
 A. Well, the only thing I knew, it was for the Tennesseans for Tyree headquarters that was it except that we were asked to have it signed and that was it.
 (George Dukas deposition).
 
 
 [7]
 The specific holding in D'Oench was subsequently codified at 12 U.S.C. Sec. 1823(e), which provides that no agreement tending to diminish or defeat the FDIC's interest in an asset shall be valid unless contained in a writing executed contemporaneously with the original note, approved by the bank's board of directors, and shown at all times as an official record of the bank. While this statute has been applied to bar defenses arising from secret side agreements between the bank and the maker of the note, it clearly does not cover cases where no actual side agreement exists and a maker is simply asserting a defense to the underlying transaction, such as the case at bar. We explained in FDIC v. Wood, 758 F.2d 156 (6th Cir.1985), cert. denied, 106 S.Ct. 308 (1986), that "although section 1823 manifests the congressional intent to protect the FDIC, it does not of itself authorize holder-in-due-course status. If the FDIC has that status, it must be as part of the federal common law." Id. at 159. We went on to create such "superstatus" for the FDIC under federal common law, any state law to the contrary notwithstanding. See generally Note, FDIC v. Wood: The FDIC, The Failed Bank, and the Seemingly Insurmountable Presumption, 17 U.Tol.L.Rev. 693 (1986)
 
 
 [8]
 But cf. FDIC v. Leach, 772 F.2d 1262, 1267 (6th Cir.1985) (stating in dicta only that "the rationale of D'Oench seems to be limited to situations in which the maker of the note knowingly contributes to the misrepresentation), also noted and explained in Investors Associates X, 775 F.2d at 154 n. 2
 
 
 [9]
 But see Leach, 772 F.2d at 1269, where Judge Merritt, dissenting, disapproves the court's elevation of the FDIC to holder-in-due-course status under principles of federal common law when the relevant state law would mandate otherwise
 
 
 [10]
 To the extent that the Dukases are contending that their defense of fraud in the inducement constitutes a real defense and therefore is not barred by the policy considerations expressed in D'Oench or our holding in Wood, their claim is without merit. Such fraud, termed "fraud in the factum," requires a showing of all of the following:
 
 
 [1]
 a misrepresentation which induced their signatures;
 
 
 [2]
 lack of knowledge of the "character" or "essential terms" of the instrument; and
 
 
 [3]
 lack of any reasonable opportunity to obtain such knowledge
 Tenn.Code Ann. Sec. 47-3-305(2)(c); U.C.C. Sec. 3-305(2)(c). See generally J. White and R. Summers, Uniform Commercial Code Sec. 14-9 (2d ed.1980). The Dukases had possession of the document overnight, and they introduced no evidence of an inability to read or comprehend the document had they chosen to do so.
 
 
 [11]
 The Dukases also allege invalidity due to the "unauthorized" filling in of the blanks. However, we find that their carelessness in executing and releasing the document with no concern for the existence of the blanks or how they would be filled in gave implied authority to the organization to which it was surrendered to fill in the blanks as necessary to complete the document. Accord Holman v. Higgins, 134 Tenn. 387, 390-94, 183 S.W. 1008, 1009 (1916)
 With respect to the Dukases' argument that the FDIC is estopped from collecting on their guaranty, we note that the defense of estoppel has succeeded against the FDIC where, by its own actions, it led a party to believe that it would not look to them for payment. See FDIC v. Harrison, 735 F.2d 408 (11th Cir.1984). However, the Dukases have alleged no acts on the part of the FDIC of that nature, but simply that the guaranty, being "void" on its face, gave rise to actual notice. Such allegations do not make out a claim of estoppel.
 
 
 [12]
 Judge Hull, Chief Judge of the United States District Court for the Eastern District of Tennessee, has discerned the dichotomy courts have created with respect to the imputation of knowledge via a records examination by the FDIC. In Kile v. FDIC, 641 F.Supp. 723, 728 (E.D.Tenn.1986), Judge Hull notes that:
 [I]t seems as if the Courts of Appeals have given it to the FDIC both ways. In the Sec. 1823(e) side agreement cases the courts assert the need of the FDIC to rely upon the bank records in assessing asset value, which is an integral step in the decision of whether to undertake a purchase and assumption transaction. See FDIC v. Merchants National Bank of Mobile, 725 F.2d 634 (11th Cir.1984), cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). On the other hand, when a defense is asserted which cannot be stuck down under Sec. 1823(e), and which may have been ascertained by a close examination of the loan file, the courts emphasize the inability of the FDIC to examine the bank records because of the speed with which the decision of whether to undertake a purchase and assumption transaction must be made. See Gilman v. FDIC, 660 F.2d 688 (6th Cir.1981).
 The court went on to find actual knowledge on the part of the FDIC through evidence appearing in their own examination reports. In so holding, the court rejected the rationale adopted by the Eleventh Circuit in Merchants National Bank that the knowledge of the FDIC's open-bank division not be attributed to its closed-bank division, stating "[t]he Court cannot partake of this fiction, on the basis of which the FDIC could conceivably be placed in the position of never having 'knowledge' of anything." 641 F.Supp. at 729.