United States Court of Appeals,

Fifth Circuit.

No. 91-2310.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity as Assignee of the Commonwealth Bank, Plaintiff-Appellant,

v.

Richard M. PLATO, Individually and d/b/a The McMicken Group, et al., Defendants,

Richard M. Plato, etc. and Henry Vanderkam, etc., Defendants-Appellees.

Jan. 28, 1993.

Appeals from the United States District Court for the Southern District of Texas.

Before KING, JOHNSON and DUHÉ, Circuit Judges.

KING, Circuit Judge:

The Federal Deposit Insurance Corporation (FDIC) appeals from the district court's judgment against the FDIC as plaintiff and for Richard Plato and Henry Vanderkam (d/b/a the McMicken Group) as counter-plaintiffs. We reverse in all significant respects and remand to the district court.

I.

In 1985, Plato, Vanderkam, and Richard Fuqua[1] ("the buyers"), all attorneys, began negotiations with C.E. Vetco Services, Inc. (C.E. Vetco), to purchase an oil coating facility in Houston, Texas. On March 20, 1985, the parties entered into a tentative agreement to agree.[2] In an addendum to this preliminary agreement, the buyers agreed to post a $350,000 irrevocable standby letter of credit[3] in favor of C.E. Vetco as earnest money for the proposed purchase. The buyers

---

[1]Fuqua was originally a party to this action, but has since filed bankruptcy and was dismissed.

[2]The letter agreement stated that "[t]he parties agree to enter into an agreement to buy and sell the [herein] described assets ... subject to mutual agreement" of the terms to be negotiated in the buy and sell agreement.

[3]A standby "letter of credit" is a common means of contingent financing. Such an arrangement involves a buyer contracting with a financial institution, whereby the institution will serve as a guarantor of a certain amount of money in a transaction between the buyer and a third-party seller. If the buyer breaches his agreement with the seller, the seller may seek payment from the institution. *See generally FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 427-428, 106 S.Ct. 1931, 1932-1933, 90 L.Ed.2d 428 (1986) (discussing standby letter of credit transaction); Arnold

obtained financing for the letter of credit from Commonwealth Bank (Commonwealth), a Texas institution. The buyers completed and signed an application for the letter of credit in the amount of $350,000 on April 29, 1985. Commonwealth approved the application and C.E. Vetco was listed as the beneficiary of the letter of credit, which was to be in force through June 24, 1985. The letter of credit contained the following condition precedent: Commonwealth would pay C.E. Vetco $350,000 if C.E. Vetco presented the letter of credit and certified that the buyers had failed to comply with the terms of the March 24th agreement to agree. The buyers also signed a blank promissory note for $350,000, executed a related security agreement, and provided various assets as collateral. It was the mutual understanding of Commonwealth and the buyers that the bank was authorized to complete the blank promissory note in the event that C.E. Vetco properly presented the letter of credit for payment.

The next day, on April 30, 1985, the parties finalized their negotiations and entered into a purchase and sale agreement. The parties agreed to close the deal on or before June 24, 1985. Notably, Vetco, Inc., the parent corporation of C.E. Vetco, was substituted in place of its subsidiary as the named seller in the agreement.[4] Included in the final agreement was a provision similar to the one in the agreement to agree, which referred to a $350,000 letter of credit. This provision, however, referred to a letter of credit on behalf of Vetco, Inc., rather than C.E. Vetco, even though the latter was the only named beneficiary in the March 20th agreement to agree and the April 29th letter of

---

& Bransilver, The Standby Letter of Credit, 10 U.C.C.L.J. 272 (1978); Note, *FDIC v. Philadelphia Gear:* A Standby Letter of Credit Backed By a Promissory Note is not a Deposit, 41 U.Miami L.Rev. 357 (1986).

> A letter of credit transaction actually consists of three distinct contracts: (i) the underlying purchase-and-sale agreement between buyer and seller; (ii) an application for the letter of credit filed with the financial institution by the buyer, i.e., a contract between the bank and buyer; and (iii) the letter of credit itself, a contract between the bank and seller, whereby the bank will pay a certain amount of money to the seller in the event that the buyer fails to pay the seller in breach of the underlying contract between the buyer and seller. *See Bank of Cochin Ltd. v. Manufacturer's Hanover Trust Co.,* 612 F.Supp. 1533, 1537 (S.D.N.Y.1985), *aff'd,* 808 F.2d 209 (2d Cir.1986).

[4]In both the agreement to agree and the final purchase and sale agreement, the authorized representative and signatory for both parent and subsidiary was William Becker.

credit.[5]

Sometime after April 30, 1985, Commonwealth—at the request of an official of Vetco, Inc., William Becker—altered certain terms of both the application and letter of credit itself. The beneficiary of the letter of credit was changed from C.E. Vetco Services, Inc., to Vetco, Inc. Commonwealth also changed the terms of the condition precedent in the application for the letter of credit: rather than requiring C.E. Vetco to present the letter of credit and certify that the buyers had breached the March 20th agreement to agree, the altered letter of credit required Vetco, Inc. to present the letter of credit and certify that the buyers were in breach of the April 30th purchase and sell agreement. These changes were in keeping with the substitution of Vetco, Inc. for C.E. Vetco as the named seller in the final purchase and sell agreement. Furthermore, the expiration date was changed from June 24, 1985, to June 28, 1985. A comparison of the original and altered versions of the two letters of credit indicates that Commonwealth simply whited out the altered portions of the original letter and typed over them.[6]

In the following months, the buyers failed to carry through with their obligations set forth in the purchase and sale agreement. On June 24, 1985, Vetco, Inc. responded by presenting the letter of credit to Commonwealth for payment. After Vetco, Inc. certified that the buyers had breached the purchase and sale agreement, Commonwealth paid Vetco, Inc. $350,000 according to the terms of the altered letter of credit. Commonwealth then unilaterally completed the promissory note that the buyers had signed in blank. The buyers initially did not dispute the propriety of Commonwealth's payment of the letter of credit and consequent activation of the promissory note. Indeed, over the next few months, the buyers actually made numerous payments on the note. They also executed an

---

[5]The parties apparently considered the April 29th letter of credit to apply jointly to the parent and subsidiary. The purchase and sale agreement recited that a letter of credit "has been delivered to Seller," obviously referring to the letter executed the previous day.

[6]The parties are in dispute whether Commonwealth's alteration of the letter of credit was authorized by an agent of the buyers. The parties also are in dispute whether Commonwealth mailed copies of the altered letter of credit to the buyers. The buyers contend that they not only did not authorize the alteration, but also were entirely unaware that any alteration had occurred until many months after it took place.

extension of the loan in the form of a second promissory note.[7] However, by early 1986, the buyers fell behind in their payments and eventually defaulted on the note. At the time of the default, Vanderkam had paid the sum of $134,419, which included the liquidation of his collateral. Commonwealth also possessed Plato's collateral, 50,000 shares of preferred stock issued by Tejas Oil and Gas, Inc.

Commonwealth proceeded to file suit in Texas state court for the unpaid balance of the second promissory note. It was at this point that the buyers claim that they first discovered that Commonwealth had altered the original letter of credit. The buyers proceeded to file a counterclaim against Commonwealth for return of the payments made on the note and for return of all remaining collateral that had been pledged as security for the letter of credit. On April 29, 1989, Commonwealth was declared insolvent and the FDIC was appointed as receiver. All non-performing assets, including the buyers' $350,000 promissory note, were assigned to the FDIC in its corporate capacity. The FDIC was also substituted as plaintiff and counterdefendant in Commonwealth's pending state court suit against the buyers. The FDIC subsequently removed the action to federal court. In addition to its claim for the unpaid balance of the note, the FDIC also sought quantum meruit damages, claiming that the buyers had been unjustly enriched by Commonwealth's five-day extension of the expiration of the letter of credit.

After a two day bench trial, the district court entered judgment against the FDIC on its claims and for the buyers on their counterclaims. The district court found that Commonwealth, without authorization from the buyers, had materially altered the original application and letter of credit, which absolved the buyers of liability for their default on the promissory note. The district court also rejected the FDIC's contention that the buyers ratified the altered application and letter of credit by making payments on the promissory note; in this regard, the court specifically found that the buyers made the payment without any knowledge that any alteration had occurred. The court also held that the FDIC was not entitled to quantum meruit damages under well-established equity principles; the

---

[7]The renewal note was essentially identical to the first note, save the amount of payment and date of execution.

court imputed Commonwealth's "unclean hands" to the FDIC. Finally, the district court summarily rejected the FDIC's argument that it should prevail under either the holder-in-due-course or *D'Oench Duhme* doctrines. The court not only entered a "take nothing" judgment for the FDIC on its claim, but also ordered the FDIC to pay Vanderkam $134,419 and return Plato his 50,000 shares of stock. The court thereafter denied the FDIC's joint motion, pursuant to Federal Rules of Civil Procedure 59 and 60, for relief from judgment and a new trial.

## II.

On appeal, the parties have raised myriad issues relating to liability and damages with respect to the FDIC's claims and the buyer's counterclaim. Because we believe that the district court committed error by summarily rejecting the FDIC's assertion of the *D'Oench Duhme* doctrine,[8] we need not address the bulk of issues on appeal, as our holding regarding *D'Oench* is dispositive of them.[9] Because we reverse the district court as a matter of law, we need not address any of the court's fact-findings that are challenged by the parties on appeal.

The district court rejected the FDIC's invocation of *D'Oench* with the following conclusory statement: "*D'Oench Duhme,* involving attempts by borrowers to avoid payment of promissory notes by asserting oral side agreements with the lender, is clearly inapplicable to the case at bar." The FDIC argues that the district court misunderstood *D'Oench.* The FDIC specifically contends not only that this case does in fact involve an "oral side agreement," but also that even if it did not *D'Oench* would

---

[8]*See D'Oench Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). 12 U.S.C. § 1823(e) is the statutory analogue of the *D'Oench Duhme* doctrine. While related, the two are considered distinct. *See FDIC v. McClanahan,* 795 F.2d 512, 514 n. 1 (5th Cir.1986). For purposes of this appeal, however, the two are interchangeable. The relevant portion of § 1823(e), that also finds expression in the common law doctrine, is as follows: "No agreement which tends to diminish or defeat the right, title, or interest of the [FDIC] in any asset acquired by it under this section ... shall be valid against the corporation unless such agreement (1) shall be in writing...."

[9]We note that *D'Oench* may serve not only as a sword but also as a shield for the FDIC: that is, the doctrine may be invoked by the FDIC not only in its capacity as a plaintiff suing to recover on a note or contract—the validity of which is disputed by the opposing party—but also in defeating a claim asserted against the FDIC. *See Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d 46, 49 (1st Cir.1991); *FSLIC v. Gemini Manag.,* 921 F.2d 241, 244 (9th Cir.1990); *FDIC v. Kasal,* 913 F.2d 487, 493 (8th Cir.1990). In the instant case, the FDIC invokes *D'Oench* both offensively and defensively.

still apply. We agree on both counts.

We have carefully examined the buyers' original and altered applications for the letter of credit filed with Commonwealth, as well as the two promissory notes (the first signed in blank by the buyers and later filled in by Commonwealth) and the security agreement governing the collateral provided to secure the promissory note. Nowhere in the applications is there any cross-reference to any promissory note. Indeed, the extensive boilerplate language appears to constitute a discrete bilateral contract between the applicant and the bank; no promissory note is contemplated by its terms. Furthermore, nowhere in the promissory notes or security agreement is there a cross-reference to either the applications for the letter or credit or the letter of credit itself. In particular, the promissory note simply states that it is "[f]or value received"; it also contains standard boilerplate governing repayment and default. The security agreement likewise contains boilerplate and simply states that the $350,000 of indebtedness being secured with collateral was for the purpose of "personal indebtedness."

Thus, the promissory notes are facially distinct from the applications for the letter of credit. *Cf. FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 428, 106 S.Ct. 1931, 1933, 90 L.Ed.2d 428 (1986) ("Although the face of the note did not so indicate, both Orion and Penn Square understood that nothing would be considered due on the note, and no interest charged by Penn Square, unless Philadelphia Gear presented drafts on the standby letter of credit after nonpayment by Orion."). The only nexus between the promissory note and security agreement, on the one hand, and the application and letter of credit, on the other hand, is a *parol agreement* between Commonwealth Bank and the buyers entered into at the time that the application for the letter of credit was submitted in April 1985. While a strong case can be made that Commonwealth and the buyers mutually understood that the promissory note applied only to the letter of credit transaction, such a claim is simply not actionable under *D'Oench* and § 1823(e), which mandate that such collateral agreements must be in explicit *written* form.[10] As has been repeatedly recognized, the common rationale of *D'Oench* and § 1823(e)

---

[10]Similarly, we recognize that, if this were an action between Commonwealth and the buyers, principles of law specifically governing the relationship between a lending institution and an applicant for a letter of credit perhaps would dictate a different result. *See, e.g., Philadelphia*

is to facilitate to the maximum degree the FDIC's ability to assess the condition of an insolvent bank solely based on its *written* records. "The doctrine means that the government has no duty to compile oral histories of the bank's customers and ... officers." *See Bowen v. FDIC,* 915 F.2d 1013, 1016 (5th Cir.1990). In this case, FDIC auditors found a promissory note that made no reference to any other agreement. Because the promissory note was facially unrelated to the letter of credit transaction, *D'Oench* forecloses any claim by the appellees that the promissory note is invalid.

Alternatively, even if we were to agree with the appellees that no unrecorded, oral agreement is at issue in the instant case, there is an alternative reason for reversing the district court on *D'Oench* grounds. As the FDIC correctly contends, the district court erred by limiting *D'Oench* to "oral side agreements." In its expansive evolution since 1942, the *D'Oench* doctrine and its statutory analogue have been applied to a wide variety of circumstances besides collateral oral agreements not evident in a failed bank's records. *See FDIC v. Hamilton,* 939 F.2d 1225, 1228 (5th Cir.1991); *see generally,* Note: Borrower Beware: *D'Oench, Duhme* and Section 1823 Overprotect the Insurer When the Bank Fails, 62 S.Cal.L.Rev. 253 (1988). While most of that evolution has occurred in the lower courts, even the Supreme Court has applied *D'Oench* and § 1823(e) to tortious conduct committed by a failed financial institution. *See Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) (failed bank's fraudulent misrepresentation and inducement trumped by *D'Oench* ). In fact, the Supreme Court implied that only a species of tort actually rendering a contract void ab initio—e.g., "fraud in the factum"—would prevent a court from applying *D'Oench. See id.* at 94. Plato and Vanderkam argue that "fraud in the factum" occurred in the present case.

We disagree.[11] Commonwealth's actions consisted of the alteration of the buyer's application

---

*Gear Corp. v. Central Bank,* 717 F.2d 230, 236 (5th Cir.1983) (discussing the doctrine of "strict compliance" in litigation concerning letters of credit, *citing* White & Summers, *Uniform Commercial Code* § 18.7 at 742-43 (1972)). However, such principles have their origin in state commercial law, which is preempted by the federal doctrine embodied in *D'Oench, Duhme* and § 1823(e). *See D'Oench,* 315 U.S. at 473-74, 62 S.Ct. 686-87.

[11]We note that appellees did not make this argument below; therefore, they may not properly advance this claim for the first time on appeal. *See Lindsey v. FDIC,* 960 F.2d 567, 572 (5th Cir.1992) ("[T]he Lindseys argue that even if title did pass to MBank upon foreclosure, ... MBank committed real fraud, or fraud in the factum. The Lindseys did not raise this claim below. This Court will not address an issue raised below for the first time on appeal...."). Thus, we reach the

and the letter of credit. While possibly a "material" alteration,[12] Commonwealth's unilateral changes hardly were injurious to the buyers. The substitution of Vetco, Inc. as the letter's beneficiary—merely substituting the parent corporation for its subsidiary—and the corresponding change in the condition precedent were simply nominal alterations contemplated by the express language of the purchase and sale agreement. Furthermore, the extension of the expiration date by five days in no way prejudiced the buyers.[13] It is not as if Commonwealth's alterations increased the amount or terms of repayment. Appellees appear to be clinging to a technicality in the hope of extinguishing their otherwise lawfully incurred debt.

Furthermore, even if Commonwealth's actions did constitute "material alteration" as that term is commonly understood, numerous courts, including this court, have addressed the question of whether *D'Oench* or § 1823(e) is operative when a failed financial institution materially altered, or wrongly augmented, the terms of a partially completed instrument or document. *See, e.g., FDIC v. Caporale,* 931 F.2d 1 (1st Cir.1991); *FSLIC v. Murray,* 853 F.2d 1251 (5th Cir.1988); *FDIC v. Morrison,* 816 F.2d 679 (6th Cir.1987); *FDIC v. McClanahan,* 795 F.2d 512 (5th Cir.1986); *FDIC v. Hatmaker,* 756 F.2d 34 (6th Cir.1985). Such cases have relied on a well-recognized component of the larger *D'Oench* doctrine—that when a party "lent himself" to a scheme that could mislead federal bank examiners, whether or not done unwittingly, he cannot circumvent *D'Oench* by arguing that the failed bank wrongly altered or augmented an incomplete instrument which he signed. *See D'Oench,* 315 U.S. at 460, 62 S.Ct. at 680; *Caporale,* 931 F.2d at 2 ("By signing blank notes, the Caporales 'lent themselves' to a scheme that could mislead bank examiners."); *McClanahan,* 795 F.2d at 515 (same). In the instant case, the buyers—all sophisticated attorneys—should have

merits of this claim only in the alternative.

[12]*See, e.g.,* Tex.Bus. & Com.Code, § 3.407 (Vernon's 1992). Adopting the U.C.C. definition, the Texas statute defines "material" alteration as including a change in "the number or relation of the parties."

[13]Indeed, that extension is the basis of the FDIC's quantum meruit claim, which seeks to disgorge an unjust *enrichment* to the buyers. We also note that the alteration was in fact insignificant in that Vetco, Inc. presented the letter of credit on June 24, 1985, which was the last day it could have done so under the original agreement.

foreseen the consequences of signing a blank promissory note.[14]

### III.

Accordingly, we REVERSE not only the district court's entry of a take-nothing judgment on the FDIC's claim, but also the court's order that the FDIC must return to Vanderkam the $134,419 that he had previously paid on the note and return to Plato his 50,000 shares of stock given as collateral. We AFFIRM the district court's judgment on the FDIC's claim only insofar as it refused to award quantum meruit damages. We REMAND for the entry of judgment (including, if and to the extent allowed under law, interest, costs, and attorneys fees). Costs of this appeal shall be borne by the appellees.

---

[14]We briefly note two other issues raised on appeal that are not disposed of by our application of the *D'Oench* doctrine in this case. First, FDIC argues that the district court erred in refusing to award the FDIC quantum meruit damages in addition to its contract claim on the promissory note. The FDIC specifically argues that the buyers were unjustly enriched on account of the five-day extension of the expiration date. We agree with the district court that restitutionary damages were not appropriate. The buyers did not request that extension and, according to the evidence at trial, the buyers were not even aware of the extension until well after the altered letter of credit had expired. Commonwealth's officious actions are not a proper basis for this type of equitable relief. Additionally, we note that it appears that there was no enrichment of any type based on the alteration of the expiration date from June 24, 1985, to June 29, 1985, as Vetco, Inc. presented the letter of credit on June 24th—the last valid day under the original letter of credit.

Another issue we must briefly address concerns Vanderkam and Plato's claim that the trial court failed to award them attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d). Because the Act only applies to a "prevailing party," *id.* § 2412(d)(1)(A), our reversal renders this particular claim moot.