**Seymour GILMAN and wife, Rosalind K. Gilman, Plaintiffs-Appellees, Cross-Appellants,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant-Appellant, Cross-Appellee.**

**Nos. 79–1649, 79–1668.**

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1981.

Decided and Filed September 30, 1981.

Rehearing Denied Nov. 18, 1981.

---

James W. McDonnell, Jr., Wildman, Harrold, Allen, Dixon & McDonnell, Mimi P. White, Memphis, Tenn., for defendant-appellant, cross-appellee.

Ronald Lee Gilman, Farris, Hancock, Gilman, Branan, Lanier & Hellen, Memphis, Tenn., for plaintiffs-appellees, cross-appellants.

Before MERRITT, KENNEDY and BOYCE F. MARTIN, Jr., Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

This appeal requires us to decide whether section 7 of the Securities Exchange Act of 1934 and Regulation U, 12 C.F.R. § 221.1(a) create a private federal cause of action for borrowers who have received bank loans, secured by stock, in violation of federal margin requirements. We must also determine whether the Federal Deposit Insur-

ance Corporation (FDIC) in its corporate capacity is chargeable, with knowledge of securities violations allegedly made by a bank, on the date the FDIC enters a Purchase and Assumption Agreement to liquidate the bank's assets.

Seymour Gilman, the plaintiff below, was a founding shareholder and director of the First American Bank in Memphis, Tennessee from its inception in 1969 until 1976. In order to acquire a substantial amount of First American common stock, Gilman borrowed funds from the National Bank of Commerce of Memphis in a series of loans. He pledged 105,146 shares of First American stock plus 500 shares of other stock to secure these loans. On June 11, 1974, Gilman owed the National Bank of Commerce $139,500 plus interest.

On February 12, 1974, First American's Board of Directors agreed to merge the bank into Hamilton Bancshares, Inc. In order to secure Gilman's vote for the proposed merger, the management of Hamilton Bancshares and Hamilton National Bank, a wholly owned subsidiary, offered Gilman sufficient credit to retire his loan and to purchase 15,771 shares of Hamilton Bancshares, which he would receive after the merger in exchange for his First American shares.[1] Gilman accepted this offer, in part because the National Bank of Commerce had increased the interest rate on his original loan. On June 11, Gilman and his wife executed a note to Hamilton National Bank for $139,500, the proceeds of which were deposited in Gilman's First American checking account. Gilman then retired the National Bank of Commerce loan and delivered his First American shares to Hamilton National Bank as collateral for the new loan.

On February 16, 1976, twenty months after the First American-Hamilton Bancshares merger, the Comptroller of the Currency declared Hamilton National Bank insolvent and appointed the FDIC as Receiver. In this capacity, the FDIC was obligated to marshal Hamilton National Bank's assets for the benefit of its creditors and shareholders. In its corporate capacity, the FDIC was obligated to insure Hamilton National Bank's deposits. 12 U.S.C. § 1823. As insurer of an insolvent bank the FDIC may adopt one of two statutory procedures: 1) it may arrange to pay the insured deposits and liquidate the bank's assets over a period of time; or 2) it may assist the FDIC as Receiver through a "Purchase and Assumption" transaction whereby it agrees to purchase certain assets from the Receiver.[2] In Hamilton National's case, the FDIC exercised the latter option.

The Purchase and Assumption transaction required the FDIC to find an outside bank willing to assume Hamilton National Bank's liabilities in return for a compensatory amount of assets. The FDIC accepted a $16,000,000 bid from First Tennessee Bank for Hamilton National Bank's remaining assets. On February 16, 1976, pursuant to this accepted bid, two agreements were completed simultaneously: 1) the FDIC as Receiver entered a Purchase and Assumption agreement which granted First Tennessee the right to examine the asset portfolio and return any undesirable loans to the Receiver within 180 days; and 2) the corporate FDIC completed a Sale of Assets agreement with the Receiver, obligating the corporation to purchase at full face value all loans First Tennessee might return. For this purpose, the corporate FDIC agreed to pay the Receiver $54 million, which the Receiver in turn paid to First Tennessee. First Tennessee acquired all of Hamilton National Bank's loans, including the Gilman note, on February 16.

On March 1, 9, and 15, Gilman's counsel wrote three letters,[3] all claiming that the Gilman note from Hamilton National Bank

---

1. Hamilton Bancshares and Hamilton National Bank made similar offers to other directors of First American who had outstanding stock loans that might be called.

2. This buy-back procedure is favored because it minimizes loss to depositors, conserves the as-

sets of the insurance fund and maximizes the value of the insolvent bank's assets.

3. The first was sent to Hamilton National, the second to First Tennessee, and the third to the FDIC.

was illegal and unenforceable because it violated Regulation U and other provisions of the federal securities laws. Based on these letters, First Tennessee decided to return the Gilman note, along with several million dollars worth of other undesirable loans, to the Receiver on March 17, 1976. The Receiver, in turn, required the corporation to repurchase these questionable assets. Thus, the corporate FDIC acquired the loan at issue here.

On March 30, 1976, the Gilmans sued Hamilton National Bank and the FDIC as Receiver, seeking rescission of the note under section 29(b) of the Securities Exchange Act of 1934,[4] and damages under section 7 of the Act.[5] The Gilmans contended principally that the loan was void because it exceeded the maximum loan value of the stock pledged as collateral in violation of Regulation U, 12 C.F.R. § 221.1(a). Despite the ironic fact that Gilman was a bank director for seven years and was thus covered by the Federal Deposit Insurance Act and chargeable with knowledge of banking regulations, the District Court found Gilman to be an "innocent, good faith borrower." The District Court allowed him to rescind the note and awarded damages measured by the amount of interest paid on the loan. The District Court denied the corporate FDIC's counterclaim for judgment on the note. In sum, the Gilmans were allowed to keep the loan proceeds, and to recover the interest they had paid. The FDIC challenges this judgment, and the Gilmans now cross-appeal for damages equal to the loss in value of the collateral they pledged to secure the loan.

On appeal, the FDIC contends that: 1) the loan did not violate Regulation U; 2) a private right of action for damages may not be inferred from section 7 of the Act or the Regulation; and 3) the FDIC was an innocent purchaser of the note, and therefore the Gilmans are not entitled to rescission

under section 29(b). We agree that section 7 does not confer a private right of action for damages on borrowers. Furthermore, we agree that the FDIC was an innocent purchaser of the Gilman note. Since we reverse the District Court on these grounds, we need not decide whether Gilman's loan violated Regulation U.

The District Court decided, and Gilman contends on appeal, that a private right of action exists for violation of the margin requirements. We disagree.

Since neither the Act nor the Regulation expressly provides for borrowers' suits, the District Court relied principally on two earlier cases of this court, *Spoon v. Walston & Co., Inc.*, 478 F.2d 246 (6th Cir. 1973) (per curiam) and *Goldman v. Bank of the Commonwealth*, 467 F.2d 439 (6th Cir. 1972), to support an implied right of action against the FDIC. These cases found an implied right of action under section 7(c) and Regulation T, 12 C.F.R. §§ 220.1 *et seq.*, which prohibit stockbrokers from extending credit to their customers in excess of the margin requirements.

This court has recently repudiated *Spoon* and its predecessor *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (Pearlstein I), to the extent these decisions permit the inference of private actions on the theory that Congress intended brokers to bear the entire burden of margin compliance. In *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194 (6th Cir. 1981), Judge Brown stated that the private cause of action rule sanctioned by *Spoon, Pearlstein*, and their progeny was no longer "viable" in light of a 1970 amendment to the '34 Act. Section 7(f) subjects borrowers themselves to the margin requirements, and prohibits customers from accepting credit that exceeds the maximum permitted by the regulations.[6]

---

4.  15 U.S.C. § 78cc(b).

5.  15 U.S.C. § 78g.

6.  Section 7(f) states, in pertinent part:

(1) It is unlawful for any United States person, or any foreign person controlled by a United States person or acting on behalf of or in conjunction with such person, to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender

Because borrowers now share with lenders the burden of observing margin requirements, the rationale for inferring a private cause of action has disappeared. *Id.; Utah State Univ. v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977). *See also* Note, *Implied Private Actions for Federal Margin Requirements: The Cort v. Ash Factors*, 47 Fordham L.Rev. 242 (1978).

The District Court did not have the benefit of our analysis in *Gutter.* However, it anticipated our reliance on section 7(f) in that case, and discounted the effect of section 7(f) and Regulation X on a borrower's right to maintain an action against a delinquent lender. The court reasoned that Congress intended to protect the small investor as a "by-product" of section 7's main macroeconomic objective, and that "such suits continue to serve the broad public purpose of national credit regulation," section 7(f) notwithstanding.

■ We cannot agree. As we noted in *Gutter*, we must follow the tests the Supreme Court outlined in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether a regulatory statute implies a private cause of action. The first factor *Cort* identifies is whether the plaintiff is one "for whose *especial* benefit the statute was enacted;" the second, and most important, is whether there is any indication of congressional intent to create a private remedy; the third is whether a private remedy is consistent with the legislative scheme; and the fourth is whether it would be inappropriate to infer a federal cause of action in an area traditionally relegated to state law. *Id.* at 78, 95 S.Ct. 2087; *Gutter v. Merrill Lynch, supra.* In *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), Justice White

stressed the limited scope of the *Cort* analysis:

As recently emphasized, the focus of the inquiry is on whether Congress intended to create a remedy. *Universities Research Assn. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors v. Lewis, supra* [444 U.S. 11] at 23–24 [100 S.Ct. 242, 62 L.Ed.2d 146]; *Touche Ross & Co. v. Redington, supra* [442 U.S. 50] at 575–576 [99 S.Ct. 2479, 61 L.Ed.2d 82]. The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide.

*Id.*, 451 U.S. at 297, 101 S.Ct. at 1781, 68 L.Ed.2d at 110.

■ The language and legislative history of section 7 convince us that Congress did *not* intend to create a remedy in favor of borrowers. Section 7's language expressly announces the aim of "preventing the excessive *use* of credit for the purchase or carrying of securities" and of accommodating "commerce and industry, having due regard to the general credit situation of the country." 15 U.S.C. § 78g(a), (b) (emphasis added). Thus section 7 presaged section 7(f) and Regulation X, for it implies by its very terms an intention to regulate those who *use* credit, namely borrowers.

Nothing in the legislative history indicates to us that Congress intended to provide a remedy for borrowers. In the first case to allow a private action under Regulation U, Judge Wyzanski concluded that the margin requirements were designed to protect the small investor, based on the following language: "[P]rotection of the small speculator by making it impossible to spread himself too thinly ... will be achieved as a byproduct of the main purpose." *Remar v. Clayton Securities Corp.*,

(without regard to whether the lender's office or place of business is in a State or the transaction occurred in whole or in part within a State) for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transac-

tion is prohibited or would be prohibited if it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State.
15 U.S.C. § 78g(f)(1) (1970). Borrowers are also subject to Regulation X, 12 C.F.R. §§ 224, *et seq.*, promulgated by the Federal Reserve System Board of Governors.

81 F.Supp. 1014 at 1017 (D.Mass.1949), *quoting* House Comm. of Interstate and Foreign Commerce, Report on H.R. 9323, H.R. Rep.No. 1383, 73d Cong., 2d Sess. 8 (1934). Judge Wyzanski and others have taken this language out of context. The inference the entire passage compels us to draw is one of macroeconomic concern for controlling the amount of credit available in the national economy:

> The main purpose of these margin provisions . . . is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a byproduct of the main purpose.
>
> *The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry* —to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans and the New York call market:

*Id.* at 7–9 (emphasis added). *See also* Climan, *Civil Liability Under the Credit-Regulation Provisions of the Securities Exchange Act of 1934,* 63 Cornell L.Rev. 206 (1978) (hereinafter "Climan"); Note, *Federal Margin Requirement as a Basis for Civil Liability,* 66 Colum.L.Rev. 1462 (1966); Comment, *Civil Remedies Based Upon Illegal Extension of Credit in Violation of Regulation T,* 61 Mich.L.Rev. 940 (1963).

The history of the House Bill that Congress ultimately adopted shows but one purpose: to effect a "better balance" in the "utilization of the Nation's credit resources." H.R.Rep.No. 1383, 73d Cong., 2d Sess. 7 (1934).[7] The Report proceeded to dismiss all "considerations which affect not a general national credit policy, but only the safety of a particular stock transaction from the standpoint of a particular lender and borrower . . . ." *Id.* at 8. In summary, the legislative history reveals a congressional intent to preclude rather than provide a private remedy for individual borrowers. *Gutter v. Merrill Lynch, supra; Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 603 F.2d 1073 (4th Cir. 1979); *Utah State Univ. v. Bear, Stearns & Co., supra.*

Although under *Sierra Club* we need look no further to deny implication of a private action, we do note that section 7(f) removes any lingering doubt about Congress' intention "to confer federal rights" on borrowers. *California v. Sierra Club, supra,* 451 U.S. at 293, 101 S.Ct. at 1779. The fact that borrowers themselves are now regulated proves to us that section 7 was not enacted for their "especial benefit." *Piper v. Chris-Craft Ind.,* 430 U.S. 1, 97 S.Ct. 1668, 52 L.Ed.2d 371 (1977); *Gutter v. Merrill Lynch, supra.*

We turn now to discuss whether Gilman is entitled to rescind his promissory note, the limited remedy provided by section 29(b) of the '34 Act.[8] The FDIC admits,

---

**7.** As one author has observed:

> The only indications of congressional intent to safeguard the interest of individual investors are isolated statements—made in justifying controversial and far-reaching legislation—by a Senate committee whose version of the margin provisions was rejected.

66 Colum.L.Rev. 1462 at 1471 (1966). Our interpretation of the legislative history is buttressed by the fact that Congress vested administrative enforcement of the margin requirements in the Federal Reserve Board, rather than the Federal Trade Commission or the Securities Exchange Commission, as earlier drafts envisioned. *See* S. 2693, 73d Cong., 2d Sess. (1934); H.R. 7852, 73d Cong., 2d Sess. (1934). *See also* Climan, *supra* at 218.

**8.** Section 29(b), 15 U.S.C. § 78cc(b), states in pertinent part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as

and we assume for purposes of this appeal, that a borrower may have a limited right to rescind a loan that violates Regulation U under *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) and *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

However, the FDIC contends on appeal that sections 29(b)(2) and 29(c)(2) [9] preclude Gilman's offensive and defensive claims for rescission, because the FDIC acquired the Gilman note without actual knowledge of Hamilton National Bank's margin violation. The District Court rejected the FDIC's "innocent purchaser" defense for the following reasons: 1) the corporate FDIC acquired the note on March 17 with knowledge of Gilman's challenge; 2) even if the FDIC acquired the note on February 16, it is chargeable with knowledge of the violation since "an examination of plaintiff's loan file on that date would have shown [irregularities] even then"; and 3) because the corporate FDIC purchased the note from itself as Receiver, it is "questionable" whether it acquired the note "in good faith," "for value." In essence, the lower court concluded that the FDIC is on notice of all possible defenses to every loan it agrees to repurchase, on the day it enters a Purchase and Assumption Agreement with an assuming bank.

We reject this conclusion for several reasons. First, the express language of the statute requires a showing of actual rather than imputed knowledge or notice. The District Court erred in charging the FDIC, in each of its dual capacities, with knowledge that it did not in fact have as of February 16, and had no means to obtain.

█ In our view, the FDIC is under no duty, in either of its capacities, to examine the assets of a failed bank before it agrees to execute Purchase and Assumption and Sale of Assets agreements. By necessity, in this as in every case, these agreements were transacted quickly to protect the insolvent bank's status as a "going concern." Neither First Tennessee nor the FDIC had time to examine Hamilton National Bank's assets immediately to determine their value or validity. Thus First Tennessee, as purchaser, was given 180 days in which to return assets to the Receiver, up to a specified dollar maximum. In order to facilitate the agreement with First Tennessee, the corporate FDIC agreed on February 16 to

regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation: *Provided*, (A) That no contract shall be void by reason of this subsection because of any violation of any rule or regulation prescribed pursuant to paragraph (2) or (3) of subsection (c) of section 78*o* of this title, and (B) that no contract shall be deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection, by any person to or for whom any broker or dealer sells, or from or for whom any broker or dealer purchases, a security in violation of any rule or regulation prescribed pursuant to paragraph (1) of subsection (c) of section 78*o* of this title, unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation.

**9.** Section 29(c), 15 U.S.C. § 78cc(c), provides that:

Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created prior or subsequent to the enactment of this chapter, unless at the time of the making of such loan or extension of credit (or extension or renewal thereof) or the creating of such lien, the person making such loan or extension of credit (or extension or renewal thereof) or acquiring such lien shall have actual knowledge of facts by reason of which the making of such loan or extension of credit (or extension or renewal thereof) or the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien.
June 6, 1934, c. 404, § 29, 48 Stat. 903; June 25, 1938, c. 677, § 3, 52 Stat. 1076.

buy all returned assets from the Receiver at their full face value.[10]  To require the FDIC to examine thousands of loans on the day it assumes an insolvent bank's portfolio would create a difficult administrative burden. This we decline to do.

Second, the District Court decided that a section 29 defense was unavailable in any event, because the corporate FDIC had actual knowledge of the alleged violations on March 16, when it automatically repurchased the Gilman note, among others. This "actual knowledge" was shown by the three prior letters from Gilman's counsel, which raised the Regulation U issue.  We disagree, and hold that actual knowledge must be shown as of the date the FDIC entered into the Purchase and Assumption and Sale of Assets agreements.  For purposes of section 29, both the Receiver and the corporate FDIC effectively acquired rights and obligations under the Gilman note on February 16, when they irrevocably committed themselves to repurchase any assets First Tennessee might refuse.  Since Gilman's letters arrived weeks after this date, the FDIC did not have actual knowledge of the alleged Regulation U violation at the critical time.

Were we to follow the District Court on this point, the FDIC as insurer would be placed in an untenable position.  To hold the FDIC responsible retroactively for the misdeeds of its predecessors of which it is ignorant when it agrees to repurchase all returned assets would hamper the FDIC's ability and inclination to opt for a Purchase and Assumption arrangement.  The FDIC would never be able to enter one with a clear assessment of the amount of worthless paper and litigation it might face.  This dilemma would, in turn, frustrate the public policies behind the scheme of national banking insurance.

In *Gunter v. Hutcheson*, 492 F.Supp. 546 (N.D.Ga.1980), a recent case also stemming from the collapse of Hamilton National Bank, the court discussed the important policies served by the rule we adopt:

> It would be difficult, if not impossible, for the FDIC to evaluate expeditiously an insolvent bank's numerous loans .... The need for such expeditious implementation of a purchase and assumption suggests that the FDIC must be governed by a uniform rule requiring that it be on guard only against fraud of which it has actual knowledge *at the time the purchase and assumption transaction begins* ....  If a different rule were permitted, the FDIC would be forced to enter or not enter the transaction on the basis of incomplete information and thus at great risk.

*Id.* at 555, 556.

Although *Gunter* involved a claim based on common law fraud, the interests of uniformity compel us to apply the same time rule here.  The record shows that the FDIC had no knowledge of the alleged Regulation U violation on the day it entered the Purchase and Assumption and Sale of Assets agreements.  Because the corporate FDIC acquired the Gilman note in good faith,[11] for value, and without actual knowledge, it has a complete defense to Gilman's rescission claim as an innocent purchaser of the note.  Similarly, Gilman may not assert the alleged violation as a defense to the FDIC's claim for judgment on the note.

Accordingly, we reverse the judgment of the District Court, and remand for entry of judgment on the note, with interest, in favor of the FDIC.

---

10. We note that these repurchase funds are public funds, which come from the FDIC's insurance reserve.

11. Contrary to Gilman's assertion, the intra-FDIC transaction satisfies the "good faith" criterion.  The FDIC may deal with itself in its dual capacities as Receiver and corporate insurer.  *See F. D. I. C. v. Ashley*, 585 F.2d 157 (6th Cir. 1978); *Gunter v. Hutcheson, supra.*