**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Plaintiff,**

v.

**GRUPO GIROD CORPORATION, Enrique N. Vela, and Carlos A. Quilichini Paz, Defendants.**

Civ. No. 84–2427(JP).

United States District Court, D. Puerto Rico.

Feb. 29, 1988.

Gustavo A. Gelpí, Feldstein, Gelpí, Hernández & Gotay, Old San Juan, P.R., for plaintiff.

Ramón Lloveras Otero, San Juan, P.R., for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action for collection on two promissory notes. The notes are acquired by the Federal Deposit Insurance Corporation (FDIC) as part of the assets of the now-defunct Girod Trust Company (GTC). GTC was closed on August 16, 1984, by order of the Secretary of the Treasury of the Commonwealth of Puerto Rico. FDIC accepted the tender of appointment of receiver of GTC, as it was statutorily required to do insofar as GTC was an FDIC-insured bank. 12 U.S.C. § 1821(e). The FDIC, as receiver, sold the assets of GTC to FDIC in its corporate capacity. This intracorporate action is permitted by statute.[1] FDIC then embarked on a course of attempting to recover those assets. Suit for collection of these notes is part of that endeavor. The subject matter jurisdiction of this case before this Court is found in 12 U.S.C. § 1819 Fourth.[2] *See also* 28 U.S.C. § 1345.

Pending before the Court are the remaining parties' cross motions for summary judgment.[3] Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Court must examine the record "in the light most favorable to ... the party opposing the motion." *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1972). Similarly the court must indulge all inferences favorable to the party opposing the motion. These rules must be applied with recognition of the fact that it is the function of summary judgment "to pierce formal allegations of facts in the pleadings ...", and to determine whether further exploration of facts is necessary.

---

1. "[T]he Corporation ... may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank.... [T]he Corporation as receiver thereof, is authorized to contract for such sales." 12 U.S.C. § 1823. The propriety of this intracorporate transaction has been sanctioned by the courts without exception. *E.g., Federal Deposit Ins. Co. v. de Jesús Vélez,* 678 F.2d 371, 374 (1st Cir. 1982).

2. "All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy." 12 U.S.C. § 1819 Fourth.

3. GTC never answered the complaint, was found in default, and partial judgment was entered accordingly. Defendant Carlos A. Quilichini was discharged pursuant to a Chapter 7 bankruptcy proceeding. Defendant Enrique N. Vela Colón is still in this case.

The language of Rule 56(c) sets forth a bifurcated standard which the party opposing summary judgment must meet to defeat the motion. He must establish the existence of an issue of fact which is both "genuine" and "material." A material issue is one which affects the outcome of the litigation.

*Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975) (citations omitted), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). *Federal Deposit Ins. Co. v. Roldan Fonseca*, 795 F.2d 1102, 1105 (1st Cir. 1986); *Santoni v. FDIC*, 677 F.2d 174, 177 (1st Cir.1982).

The existence of some alleged factual dispute will not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Materiality is defined by the substantive law governing the case. *Id.* 106 S.Ct. at 2510.

Defendant's motion for summary judgment is based on the theory that, as a matter of Puerto Rico law, the mortgage covering the notes and the notes themselves are no longer enforceable because the obligations evinced by the notes were satisfied. Plaintiff's cross motion argues that defendants' conduct evinces at least an attempt to form an agreement that the notes would be used as bank assets while remaining, for practical purposes, uncollected and possibly uncollectible. This purported agreement, FDIC argues, may not be used as a defense to its efforts to call in the note. For the reasons elucidated here, the Court finds against defendants and in favor of the FDIC.

## I. FACTUAL BACKGROUND

On September 1, 1981, Vela and Quilichini executed a promissory note in the amount of $65,000.00, payable to GTC on demand with 17% interest per annum. On February 2, 1982, Vela and Quilichini executed a promissory note payable on demand in the amount of $140,000.00 with interest at the Citibank prime rate, payable to GTC. Both notes carried the guarantee signatures of Robert S. Prann and José López Matos. On February 19, 1982, Vela and Quilichini executed an Aircraft Chattel Mortgage of $205,000.00 evidenced by the two notes. Two aircraft were at stake in the mortgage. The first was 1981 Piper Dakota bearing the number N8271T in the Registry of the Federal Aviation Administration (FAA); the second was a 1980 Piper Seneca bearing the FAA Registration No. 82157.[4] The mortgage was also recorded in the FAA Registry.

On or about November 24, 1982, title to both the Dakota and the Seneca were transferred to PLMQV Enterprises Corporation. The stockholders of PLMQV were Prann, López Matos, Quilichini, and Vela. The Dakota was sold by Vela and Quilichini for $62,462.00, slightly less than the original purchase price. PLMQV Enterprises obtained the funds to purchase the Dakota from a loan provided by GTC. The Seneca was likewise sold to PLMQV and paid for with GTC-loaned funds. The Seneca was sold for $140,000.00, its original purchase price. PLMQV Enterprises later sold the Seneca to Grupo Girod Corporation (GGC) for $147,000.00 on January 4, 1983. GGC obtained a loan of $147,000.00 from GTC to finance the purchase. At the time of sale, the loan to PLMQV Enterprises had accumulated interest of $6,962.43. The sale to GGC therefore provided barely adequate funds to cover PLMQV Enterprises' loan and interest.

The records of GTC concerning the PLMQV Enterprises loan are marked "Paid" and are credited with a total of $146,962.43 on January 4, 1983. The January 4, 1983, check from Grupo Girod Corp. to PLMQV Enterprises for $147,000.00, in apparent payment for the Seneca, is endorsed on the back as follows:

"For deposit ONLY to the account of Enrique N. Vela Colón and Carlos A. Quilichini at Girod Trust Company Account 00–01–00324–6
PLMQV Enterprises Corp.
por: s/Enrique N. Vela

4. The FAA Registry Number was later changed to N84GT. Neither party considers this change of any moment and it in no way affects the Court's analysis of the pending motions.

Enrique N. Vela
Secretario"

The Secretary of PLMQV Enterprises, Vela, had endorsed the GGC check over to the personal account of himself and Quilichini. On that same date, January 4, 1983, the account record of Vela and Quilichini's personal account shows a debit of $146,-962.43, the same amount PLMQV Enterprises owed GTC on the Seneca loan.

Throughout each of these transactions, neither Vela nor Quilichini requested that either the Aircraft Chattel Mortgage or the two promissory notes be cancelled. Instead, Vela wrote three letters subsequent to these transactions. The first, dated February 10, 1983, and addressed to GTC, confirms PLMQV Enterprises' acquisition of the Dakota and acknowledges the existence of the Aircraft Chattel Mortgage covering the Piper and registered with the FAA. The second letter, dated February 24, 1983, and also addressed to GTC, gives instructions that the Aircraft Chattel Mortgage be filed as collateral for the PLMQV Enterprise/Dakota loan and the GGC/Seneca loan. On June 7, 1983, Vela again wrote to GTC concerning the Seneca and one other airplane unrelated to this litigation. That letter notes that a title search on the Seneca revealed a mortgage of $137,500.00 in favor of the Royal Bank of Canada. That mortgage had since been cancelled and Vela included a photocopy of the cancellation. Although the title search also revealed the Aircraft Chattel Mortgage involved in this case, the June 3 letter does not mention that encumbrance.

On August 16, 1984, the Secretary of the Treasury of the Commonwealth of Puerto Rico declared GTC insolvent, ordered it closed, and tendered the receivership of GTC to FDIC. As previously noted, FDIC accepted the appointment, FDIC qua receiver sold the assets of GTC to FDIC qua corporation, and this attempt to recover the funds ensued.

## II. DEFENSE OF SATISFACTION OF OBLIGATION UNDER THE 1932 COMMERCIAL CODE OF PUERTO RICO

The main defense in this case is, that as a matter of law in Puerto Rico, because the obligations underlying the two promissory notes were satisfied, the notes themselves and the mortgages incorporating the notes are no longer enforceable. The crux of defendants' argument is found in the 1932 Commercial Code of Puerto Rico. Section 472 of the Code provides, in part, "A negotiable instrument is discharged: 1. By payment in due course by or on behalf of the principal debtor." 19 L.P.R.A. § 201. Defendants argue that the obligation evidenced by the two notes and incorporated in the Aircraft Chattel Mortgage was discharged by payment to GTC. These payments to GTC occurred upon the sale of the Seneca and the Dakota to PLMQV Enterprises on November 24, 1982.

The notes at issue are negotiable instruments. The notes were payable on demand and were not cancelled or otherwise restrictively endorsed. FDIC acquired the notes, first as receiver of the defunct GTC, then from FDIC qua receiver to FDIC in its corporate capacity. In the second transaction, FDIC paid for the assets of GTC. As such, FDIC took these notes in much the same manner as a holder in due course. B. Santiago Romero, Tratado de Instrumentos Negociables 9 (1981). Under the law of Puerto Rico governing negotiable instruments, one who takes an instrument that is complete and regular on its face before the instrument is due, in good faith and for value, and without notice of any infirmity in the instrument or defect in the title of the person negotiating the instrument, qualifies for status as a holder in due course. 19 L.P.R.A. § 92. Here, it is undisputed that the mortgage and the notes themselves were complete and regular on their faces. The good faith of the intra-FDIC sale from FDIC qua receiver to FDIC qua corporation has been examined and upheld in several circuits. *Federal Deposit Ins. Corp. v. de Jesús Vélez*, 678 F.2d 371, 374 (1st Cir.1982) (intra-FDIC transaction not sham for jurisdictional purposes); *Gunter v. Hutcheson*, 674 F.2d 862, 874 & n. 16 (11th Cir.1982); *Gilman v. Federal Deposit Ins. Corp.*, 660 F.2d 688, 694-95 (6th Cir.1981); *Federal Deposit Ins. Corp. v.*

*Ashley,* 585 F.2d 157, 160–62 (6th Cir.1978) (same as *de Jesús Vélez*); *Federal Deposit Ins. Corp. v. Godshall,* 558 F.2d 220, 222–23 (4th Cir.1977) (same as *de Jesús Vélez*). Likewise, knowledge on the part of the FDIC here cannot be imputed merely because it held all of the bank's records. The FDIC is entitled to rely on the books of the bank in deciding which assets should be sold by FDIC qua receiver to FDIC qua corporation. *Federal Deposit Ins. Corp. v. La Rambla Shopping Center,* 791 F.2d 215, 220 (1st Cir.1986). The speed with which FDIC must assume control of a failed bank as receiver and parcel out the failed bank's assets to FDIC qua corporation or others interested in the assets, in order to carry out the Congressionally mandated protection of public confidence in the banking system, precludes any claim that would rise to the level of knowledge of a defect in the instrument. *See generally Federal Deposit Ins. Corp. v. P.L.M. International,* 834 F.2d 248, 254–55 (1st Cir. 1987); *Federal Deposit Ins. Corp. v. The Cremona Co.,* 832 F.2d 959, 964 (6th Cir. 1987); *Federal Deposit Ins. Corp. v.*

*Wood,* 758 F.2d 156, 161–62 (6th Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); *Gilman v. FDIC,* 660 F.2d at 695; *Gunter v. Hutcheson,* 674 F.2d at 865–66 (discussion of FDIC procedure in closure, receivership, and purchase and assumption). Although it is not done often, given the extraordinary protections Congress has bestowed on FDIC that normally obviate this finding (see n. 5 *infra*), the Court finds that the FDIC is a holder in due course of both promissory notes at issue in this case. *See e.g., Federal Deposit Ins. Corp. v. Wood,* 758 F.2d at 161.[5]

As a holder in due course under the Commercial Code of Puerto Rico, the FDIC

> "holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Commercial Code, 1932 § 410, *codified at* 19 L.P.R.A. § 97. The question then becomes whether the defense of payment of

---

**5.** In *Federal Deposit Ins. Corp. v. Rockelman,* 460 F.Supp. 999 (E.D.Wis.1978), the district court found it unnecessary to clothe the FDIC with holder in due course status because of the protections afforded the Corporation by Congress. The *Rockelman* court describe the statutory shields provided FDIC as similar to those of a holder in due course. *Rockelman,* 460 F.Supp. at 1003.

This Court declines to follow this path for several reasons. First, although federal law governs cases in which the FDIC seeks to secure the assets it acquires in its mission, *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), defendants carefully crafted their answer and summary judgment motion to avoid federal law implications. Defendants claimed that Puerto Rico law governed their obligations. This Court finds, *infra,* that under Puerto Rico law, defendants are liable. Second, the FDIC in this case failed to meet the standards for adjudication on a motion for summary judgment. FDIC, as explained in pp. 491–92, *infra,* based its motion for summary judgment on its power under 12 U.S.C. § 1823(e) to overcome any secret agreements to circumvent defendants' liability on the notes. FDIC failed to show the applicability of that section by failing to show any agreement at all. As such, if the Court were to proceed on an overly narrow federal basis, the case would unnecessarily continue when a wholly proper basis existed and

was argued for disposition, i.e., the 1932 Commercial Code of Puerto Rico.

This Court does not see *Rockelman* as precluding the FDIC from attaining holder in due course status under local law but rather as endowing the FDIC with whatever federal power it needs to overcome local law in carrying out is mission. No endowment was required in this case.

Nor does the rule of federal law governing the FDIC action preclude this result. "To hold that federal common law shall control does not inevitably require the creation of a nationwide federal rule." *Federal Deposit Ins. Co. v. Bird,* 516 F.Supp. 647, 649 (D.P.R.1981). In *United States v. Kimbell Foods,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Supreme Court set standards for the applicability of state laws in the administration of federal programs. In part, the Court stated that the Court must "determine whether application of state law would frustrate specific objectives of federal programs ... [and] consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59. As explained herein, federal law is not directly applicable to this case and the interests and objectives of the FDIC, i.e., recovery of assets to protect the bank insurance system, are fully served by application of Puerto Rico law on these facts.

the obligation evidenced by the note may be asserted against FDIC qua corporation. Although the Commercial Code clearly establishes payment as a defense, it is only a personal defense, i.e., defendants would be able to assert this defense only against GTC. B. Santiago Romero, Tratado de Instrumentos Negociables, 188–90. Under the Commercial Code of Puerto Rico, when a party takes a negotiable instrument part of an assumption and purchase transaction, if it takes without actual notice of defects in the instrument, the party takes as a holder in due course (tenedor de buena fe) free from the defense of payment of the underlying obligation set out in § 472 of the 1932 Commercial Code. 19 L.P.R.A. § 201.[6] FDIC took the notes under these conditions and is thus freed from this defense.

## III. FDIC AND THE DEFEAT OF SECRET AGREEMENTS

The assets that the FDIC receives through its participation in a purchase and assumption transaction are protected from certain challenges by 12 U.S.C. § 1823(e):

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

FDIC argued that the movement of the promissory notes and the Aircraft Chattel Mortgage covering the Seneca and the Dakota evinced an agreement between defendants and GTC to obscure and inflate the assets of GTC while leaving the notes as uncollected and possibly uncollectible. FDIC asserted that this agreement, whatever its contours, would fail the stringent requirements of 12 U.S.C. § 1823(e) and that this agreement would not prevent FDIC from collecting on the note.

In ruling on a motion for summary judgment, however, the Court must examine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). FDIC clearly showed that *assuming* the existence of any agreement, it would be entitled to summary judgment as a matter of law. The pertinent statute and a significant body of case law support that position. *E.g., P.L.M. International,* 834 F.2d 248 (1st Cir.1987); *Roldan Fonseca,* 795 F.2d 1102 (1st Cir. 1986).

The fact, not properly raised by FDIC nor answered at all by defendants, was whether an agreement existed. The circumstances surrounding the transfers of the aircraft certainly can be read that way. Vela and Quilichini bought two airplanes

---

6. The Court notes *Federal Deposit Ins. Corp. v. Nemecek,* 641 F.Supp. 740 (D.Kan.1986). In *Nemecek,* defendant successfully argued that because the underlying obligation had been fulfilled shortly before the FDIC took over the bank, the FDIC took no asset of the bank upon its appointment as receiver. There was then, no asset to sell FDIC qua corporation, and no obligation upon which FDIC could seek enforcement. That case must be limited to its facts. The accord and satisfaction reached and asserted as a defense in *Nemecek* concerned the delivery of a quitclaim deed to the property secured by the promissory note at issue. In return, the note would be cancelled. Although the deed was delivered to the bank's attorney, there was no time to deliver the deed to the bank itself or cancel the note before the FDIC stepped in. The district court in Kansas was apparently more concerned with principles of agency in attorney-client relations and the amicable resolution of disputes than the laws of negotiable instruments.

The *Nemecek* court's analysis is flawed in its distinguishment of another case that noted settlement agreements must be in writing and approved by the bank's board of directors before they can overcome the FDIC's powers in recovering the assets of a failed bank. Contrary to the *Nemecek* court's characterization of these requirements as "merely dictum," they are, rather, statutorily mandated. 12 U.S.C. § 1823(e).

with loan proceeds. They then sold the airplanes to a corporation so closely held that it had their initials on its name for a price that just barely paid off their loan. That corporation, clearly controlled by Vela and Quilichini, then sold one of the airplanes to a corporation related to GTC with funds loaned by GTC. The purchase price, again, just barely covered the previous loan. All the while, Vela and Quilichini, licensed practitioners of law in Puerto Rico, did not call for the original notes or Aircraft Chattel Mortgage, although at one point Vela later provided GTC a cancelled copy of another mortgage purported encumbering one of the airplanes.

A factual finding, however, that the agreement existed and that Vela and Quilichini hoped to use it to avoid their obligation is simply too much to infer on a motion for summary judgment. In any event, the law of negotiable instruments in Puerto Rico is counter to their expectations, and the remaining defendant is liable on the notes.

## IV. CONCLUSION

The Court finds that, based upon the law of negotiable instruments of Puerto Rico, defendants Vela and Quilichini are liable on the two notes. Insofar as Quilichini has been discharged in bankruptcy and partial judgment was entered against defendant GGC, the FDIC is ORDERED to submit a proposed form of judgment within ten (10) days of the date of this Opinion and Order, including interest due up to this date.

IT IS SO ORDERED.