**In re Barbara Ann HOOD, Debtor.**

**Bankruptcy No. 88–02350–C.**

United States Bankruptcy Court,
W.D. Missouri, C.D.

Jan. 31, 1989.

Carrie Francke, Columbia, Mo., for debtor.

Duane Schreimann, Jefferson City, Mo., for Herington Bancshares.

Jack E. Brown, Columbia, Mo., Trustee.

## MEMORANDUM OPINION

### FACTS

FRANK W. KOGER, Bankruptcy Judge.

The debtor in this adversary proceeding, Barbara Ann Hood (hereinafter "Debtor"), initially filed for relief under Chapter 13 on May 23, 1988. Upon Debtor's motion, the case was later converted to a Chapter 7 bankruptcy pursuant to this Court's Order filed on September 30, 1988. Before the Court is a motion filed by Plaintiff, First Finance, Inc., requesting relief from the automatic stay in order that Plaintiff might enforce its asserted rights against certain collateral securing two separate promissory notes.

The first promissory note at issue involves a 1981 Lincoln Continental Town Car that Debtor purchased on February 18, 1983. Debtor financed this purchase through a promissory note in the principal amount of $10,726.56 (hereinafter the "Car Note"), executed in favor of Lake National Bank (hereinafter "LNB"). LNB secured its loan with a first lien against the car. At the December 14, 1988 hearing in which the Court considered Plaintiff's motion to lift the stay, Plaintiff stated that the balance due on the car as of June 9, 1988 was $2,407.17 and that its estimated value was between $1,850.00 and $2,200.00. Debtor's Amended Schedule of Assets, filed on December 1, 1988, and Response to Plaintiff's motion disputes Plaintiff's value estimate, declaring the car's market value to be $700.00. Both Plaintiff's and Debtor's estimates are predicated on the car's mileage of approximately 140,000 miles.

Unlike the promissory note on the car, the second promissory note carries a somewhat more lurid heritage. From about 1979 to 1986, Debtor owned and operated a business known as the Crazy Horse (Dilly's) Lounge, Inc. (hereinafter the "Corporation"). Debtor was the sole stockholder and director of the Corporation. Debtor also served as the Corporation's President. To manage the day to day operations of the business, Debtor employed an individual by the name of Robert Schnur. In addition to his role as General Manager, Schnur also served as the Corporation's Secretary. Under Debtor's ownership, the Corporation conducted all of its banking business at LNB. Pursuant to a Resolution of the Board of Directors dated August 16, 1983 (hereinafter the "Resolution"), fund withdrawals and transfers from the Corporation's general checking and payroll accounts up to $1,200.00 were authorized under the signature of either Debtor or Schnur. Any withdrawals or transfers exceeding this amount required both of their signatures. With respect to borrowing authority under the Resolution, both Debtor's and Schnur's signatures were required to borrow money in the name of the Corporation. Schnur signed the Resolution in his capacity as the Corporation's Secretary and delivered a certified copy of the same to LNB.

Unbeknownst to Debtor, LNB permitted Schnur on several occasions to borrow money on behalf of the Corporation without Debtor's requisite approval. The first such borrowing was for $10,000.00. Debt-

or claims that she first became aware of this loan in July of 1983 when LNB asked her to sign the underlying note merely as a recordkeeping formality since the loan had already been paid in full. According to Debtor, she made several demands upon LNB before it finally released the Corporation's bank records to her. Before taking these records to her accountant, Debtor personally reviewed them. Her examination revealed two other notes executed by Schnur in violation of the aforementioned Resolution. The total amount of the two loans was approximately $30,000.00. One of the notes pledged the entire inventory of the business, while the other was unsecured. Both notes were dated prior to Debtor being apprised of the above $10,-000.00 note. All the while these revelations were surfacing, the business was experiencing various financial difficulties to the extent that Debtor claims its failure was imminent. About this same time, Debtor claims that the LNB loan officer who had approved the unauthorized loans to Schnur offered to bend the rules and consolidate all of her existing indebtedness to LNB into a single new loan for the ostensible purpose of staving off failure of the business and to somehow eradicate Schnur's interest. Additional statements by Debtor suggest, however, that the real inspiration for this loan officer's otherwise unexplainable benevolence was his fear of losing his job for having loaned money in contravention of the Resolution. Debtor agreed to the proposed consolidation and executed a promissory note, dated March 15, 1984, in the principal amount of $130,-000.00, bearing interest at a rate of 13.5% per annum (hereinafter the "Consolidated Note").

In addition to the two notes signed by Schnur, the Consolidated Note subsumed the mortgage on Debtor's personal residence which consists of a lakefront home and 19 adjacent acres (hereinafter the "Residence"). At the time of the consolidation, this mortgage carried a loan balance of approximately $67,000.00. The Consolidated Note is secured exclusively by a Deed of Trust on Debtor's Residence. The balance due on the Consolidated Note as of June 9, 1988 was $191,013.23. Plaintiff maintains that the market value of the Residence is $156,500.00. Debtor insists that the property's market value is substantially less than this amount, indicating in her most recent Statement of Liabilities that its market value is $75,000.00. Although both the Car Note and the Consolidated Note are in default, Debtor claims to have made payments on each for which she did not receive credit.

As a result of an examination by the Office of the Comptroller of the Currency (hereinafter "OCC") in which it was determined that LNB's financial condition had substantially deteriorated, LNB was declared insolvent on or about December 13, 1985. The OCC subsequently appointed the Federal Deposit and Insurance Corporation (hereinafter the "FDIC") as receiver of LNB, whereupon the FDIC took possession and control of LNB's assets, including the two Notes in dispute. Pursuant to its powers as a receiver for LNB under the Federal Banking Laws, specifically 12 U.S. C. § 1823(c), the FDIC entered into a "purchase and assumption" agreement with Central Lake State Bank (hereinafter "CLSB") on December 13, 1985 under which CLSB purchased certain assets and assumed certain liabilities of LNB. Among the assets not so purchased from the FDIC were the Car Note and the Consolidated Note. Instead these Notes were purchased by the FDIC acting in its corporate insurer capacity from the receiver FDIC. Under an Assignment of Mortgage/Deed of Trust dated February 10, 1988, the corporate FDIC later sold these notes to the Bank of White City (hereinafter "BWC"), a corporation wholly owned by Herington Bancshares (hereinafter "HBC"). HBC later assigned its claim to Plaintiff with the Court's approval on October 19, 1988. Plaintiff now seeks relief from the automatic stay in order to enforce its asserted rights against the collateral.

While in possession of Debtor's two promissory notes, BWC filed a proof of claim on August 4, 1988 for a total claim of $195,620.40. Debtor filed an Objection to BWC's proof of claim and argued then, as

she does now, the following with respect to each of the two Notes:

1. Car Note

a. Although Plaintiff is a holder of this Note, Plaintiff is not a holder in due course.

b. Debtor should be allowed to redeem the car for $700.00 which represents its fair market value and a sum sufficient to satisfy Plaintiff's security interest in the vehicle.

2. Consolidated Note

a. Plaintiff is not a holder in due course of this Note, in part, for the following reasons:

1. Debtor's signature was obtained while Debtor was under duress.

2. The Note was given for past consideration and improperly consolidated certain promissory notes that Debtor had never signed.

b. The value of the property is substantially less than $156,500.00.

c. Debtor has at all times made her defenses to the Notes known to each of the Note's transferees.

## QUESTIONS PRESENTED

1. Whether Plaintiff qualifies as a holder in due course with respect to the two Notes.

2. Depending on Plaintiff's status as determined above, which of Debtor's defenses, if any, may be asserted against Plaintiff.

## DISCUSSION

I. *Plaintiff's Status Under the Notes*

█ To determine the status of Plaintiff's rights as assignee of the claim encompassing the promissory notes at issue in this case, the Court must evaluate the rights held and passed by each transferor prior to Plaintiff. While not always true, hornbook law tells us that an assignee cannot have any greater title to or interest in an instrument than was held by the person from whom the instrument was acquired.

§ 431.160 V.A.M.S. (1939). A corollary to this rule is that an assignee of an instrument takes it subject to all defenses which the maker may have against the instrument prior to notice of the assignment. *Kaw Valley State Bank and Trust v. Commercial Bank of Liberty, N.A.*, 567 S.W.2d 710, 713 (Mo.App.1978). Thus, Plaintiff acquired whatever title and interest in the Notes that its transferor, HBC, had held, and such title and interest are subject to any defenses Debtor, as maker of the Notes, may have had against the Notes while held by HBC. Because HBC similarly took whatever rights its transferor, the FDIC, had in the Notes, Plaintiff, in effect, now stands in the FDIC's shoes which were previously worn by HBC. Determining the status of Plaintiff's rights in the Notes is, therefore, a question of establishing what rights the FDIC held by virtue of its Purchase and Assumption transaction with CLSB and Assignment to HBC. Because failed banks many times have claims against foundering businesses which end up in bankruptcy and because so many banks in this area have failed, the FDIC or its assigns are appearing with great regularity in bankruptcy. One can only anticipate that soon the Federal Savings and Loan Insurance Corporation will join the ranks of major players in the courts. This Court can hardly wait until it will be necessary to wade through their enabling legislation, rules and regulations, an exercise anticipated to replace Sominex, Nytol and warm milk as a soporific in anyone's pharmacopoeia.

In its capacity as insurer of bank deposits, the FDIC has two methods of ensuring that depositors of a failed bank are paid. The first method involves liquidation of the bank's assets after which depositors are paid their insured amounts. *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). The second method, which the FDIC employed in this case, is a "purchase and assumption" transaction in which the FDIC arranges for another bank to purchase the assets and assume the liabilities of the failed bank and reopen it

immediately. *Id.* Such a transaction typically involves three entities: the FDIC as receiver of the failed bank, the purchasing bank, and the FDIC as insurer, thereby causing the FDIC to act in two separate capacities. *Id.* To make the purchase and assumption a viable and appealing business transaction, the purchasing bank is permitted to decline or return lower quality assets to the receiver. *Id.* The FDIC as insurer then purchases the returned assets from the FDIC as receiver which in turn transfers the payments to the purchasing bank. *Id.* The FDIC in its insurer, or corporate, capacity then attempts to collect on the returned assets it has purchased to minimize the insurance fund's losses. *Id.*

When the FDIC acts in its corporate capacity, it enjoys greater protection than when it acts as a receiver for a failed institution. *In re Robbins,* 91 B.R. 879, 889 (Bkrtcy.W.D.Mo.1988). Unlike in its receiver capacity, the FDIC in its corporate capacity does not merely step into the private shoes of the failed bank and thereby take title to the bank's claims against its debtors, subject to all defenses which are good against the bank. *FDIC v. Martinez*

*Almodovar,* 671 F.Supp. 851, 872–73 (D.Puerto Rico 1987). When the corporate FDIC purchases notes, it is accorded the status equivalent to a holder in due course by virtue of 12 U.S.C. § 1823(e).[1] Although § 1823(e) itself does not specifically authorize holder in due course status, the courts have divined from its language Congress' intent to vest the corporate FDIC with this elevated status. *FDIC v. Rockelman,* 460 F.Supp. 999, 1003 (E.D.Wis.1979); accord *FDIC v. Wood,* 758 F.2d 156, 159 (6th Cir.1985).[2] Put another way, "the effect of § 1823(e) is to 'upgrade' assets purchased by the [corporate] FDIC and to give the FDIC rights akin to a holder in due course." *In re Bombard,* 59 B.R. 952, 955 (Bkrtcy.D.Mass.1986).

When the FDIC in its corporate capacity, as part of a purchase and assumption transaction, acquires a note in good faith, for value, and without actual knowledge[3] of any defense against the note, it takes the note free of all defenses that would not prevail against a holder in due course. *FDIC v. Wood,* 758 F.2d at 161; see also *Gunter v. Hutcheson,* 674 F.2d at

---

**1.** Section 1823(e) provides that:

No agreement which tends to diminish or defeat the right, title or interest of the [corporate FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the [corporate FDIC] unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been continuously, from the time of its execution, an official record of the bank.

12 U.S.C. § 1823(e) (1982).

In their decisions under § 1823(e), the courts have recognized that "federal banking authorities must be able to enforce notes in accordance with their written terms, *even in the face of wrongdoing by a failed bank,* in order to ensure the smooth administration of bank insurance and avoid panic". *FDIC v. HSI,* 657 F.Supp. 1333, 1338 (E.D.La.1986) (citing *FDIC v. Investors Associates X,* 775 F.2d 152, 154 (6th Cir. 1985) and *FDIC v. Vestring,* 620 F.Supp. 1271, 1273–74 (D.C.Kan.1985).

**2.** Underlying this policy of heightened protection, is Congress' recognition that due to the need for swift action, the FDIC's only means of comparing its potential for loss under a liquidation versus a purchase and assignment agreement is reliance on the bank's books. *Gunter v. Hutcheson,* 674 F.2d at 870. To subject the FDIC's right to collect on returned assets to unknown claims, would thwart its risk assessment process and the purchase and assumption method of rescuing failed banks would no longer be viable. *Id;* see also *FDIC v. Wood,* 758 F.2d at 160–61 (essence of purchase and assumption transaction is speed, and to expose FDIC to state-law defenses would create uncertainty and prevent use of the transaction).

**3.** Actual knowledge by the FDIC of a defense must be shown as of the date of the purchase and assumption agreement. *Gilman v. FDIC,* 660 F.2d 688, 690 (6th Cir.1981). The FDIC cannot be charged with constructive knowledge of a defense merely because the bank's files contained the information. *FDIC v. Wood,* 758 F.2d at 162. This presumption of no knowledge of any defenses stems from the rule that the FDIC has no duty, whether in its receiver or corporate capacity, to examine a failed bank's assets before entering into a purchase and assumption agreement. *Gilman v. FDIC,* 660 F.2d at 690.

873. Such defenses are known as "personal defenses". *FDIC v. Wood,* 758 F.2d at 160. Unless one is a holder in due course, the instrument is taken subject to the personal defenses set forth in § 400.3–306 V.A.M.S. (1963) which, in pertinent part, are:

(a) all valid claims to [the instrument] on the part of any person; and

(b) all defenses of any party which would be available in an action in simple contract; and

(c) the defenses of *want or failure of consideration* ... § 400.3–306 V.A.M.S. (1963) (emphasis added); see *Kreutz v. Wolff,* 560 S.W.2d 271, 276 (Mo.App.1977) (one not a holder in due course takes instrument subject to defense of failure of consideration). Section 400.3–408 similarly provides that "want or failure of consideration is a defense against any person not having the rights of a holder in due course ..." Another group of defenses known as "real defenses" may, however, be asserted against a holder in due course to render the instrument invalid and unenforceable by anyone. *FDIC v. Wood,* 758 F.2d at 160. Thus, only real defenses can be raised against the FDIC in its corporate capacity. *FDIC v. Balistreri,* 470 F.Supp. 752, 756 (E.D.Wis.1979). Real defenses are enumerated in § 400.3–305 V.A.M.S. (1963) which, in pertinent part, includes:

. . . . .

(b) ... duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge or its character or its essential terms; and

(d) discharge in insolvency proceedings ... § 400.3–305 V.A.M.S. (1963).

Unlike personal defenses, real defenses challenge the validity of the note itself, rather than the underlying transaction. *FDIC v. Balistreri,* 470 F.Supp. at 756.

■ Thus, the capacity in which the FDIC has acted directly affects the ability of parties liable under a promissory note to defend against actions brought by the FDIC or its transferees to enforce the note. In the instant case, this threshold determination will dictate Plaintiff's status as assignee of HBC's claim under Debtor's notes.[4] Reference to the Purchase and Assumption Agreement between the FDIC and CLSB and the FDIC's subsequent assignment of Debtor's notes to HBC reveals that the FDIC purchased and held Debtor's Notes in its corporate capacity prior to transferring them to HBC. Further, the record contains no evidence that the FDIC, at the time it entered into the Purchase and Assumption transaction, had actual knowledge of the defenses Debtor has raised against Plaintiff. Having purchased Debtor's notes in good faith while acting in its corporate capacity, the FDIC, therefore, qualified for the statutory holder in due course status under § 1823(e). Plaintiff, by virtue of the FDIC's transfer of the notes to HBC and the latter's subsequent transfer of same to Plaintiff, stands in the shoes of the FDIC. See *Means v. Clardy,* 735 S.W.2d 6, 10 (Mo.App.1987) (assignee of note may enforce it to same extent as assignor might have enforced note). The Court thus finds that Plaintiff is a holder in due course within the meaning of § 1823(e).

## II. *Debtor's Defenses*

### A. Failure of Consideration

Because failure of consideration is a "personal defense", it cannot be asserted against a holder in due course such as Plaintiff.[5] § 400.3–306 V.A.M.S. (1963); see *FDIC v. Wood,* 758 F.2d at 160.

---

**4.** The Court notes at this point that Debtor's argument that she did not sign certain notes that were consolidated and, therefore, some of the consolidated debt is not valid or legally owed is irrelevant to the issue before Court as to the validity of the Consolidated Note which does bear her signature.

**5.** Although this defense is not available to Debtor and the Court need not evaluate its merits, the Court notes that whether or not Plaintiff qualified as a holder in due course may not necessarily have affected the availability of the defense since furnishing money to a business in which a note's maker has an interest is suffi-

## B. Duress

A promissory note obtained through duress is void and unenforceable in the hands of the payee or any person whether or not that person is a holder in due course. § 400.3–305(2)(b) V.A.M.S. (1963). Duress is a found to have occurred when one person's unlawful conduct induces another to execute a note "under circumstances which deprive the maker of the exercise of free will." *Id.* There must also be such active coercion at the time the instrument is executed that the execution of the instrument is not voluntary. *Id.* See *Manufacturers American Bank v. Stamatis,* 719 S.W.2d 64, 67 (Mo.App.1986) (duress occurs if threats caused purported victim to be deprived of free exercise of will power). Duress is tested by the state of mind created in the victim. A claim of duress cannot generally be sustained where there is knowledge of the facts and opportunity for investigation, deliberation, and reflection. *Aurora Bank v. Hamlin,* 609 S.W.2d 486, 488 (Mo.App.1980).

With respect to claims of wrongful threats, a duress defense is supportable if the threat causes such fear in the victim so as to deprive the person of the quality of mind necessary to execute a valid contract. *In re Cerar,* 84 B.R. 524, 531 (Bkrtcy.C.D. Ill.1988) (citing *Coleman v. Crescent Wire Cable Co.,* 350 Mo. 781, 168 S.W.2d 1060 (1943)). An instructive reference for purposes of the instant case is the Illinois Supreme Court's finding in *Hart v. Strong,* 183 Ill. 349, 55 N.E. 629 (1899) that the threatened foreclosure on a mortgage in default does not constitute duress. As long as the purported threats are made with the honest belief that good cause for the threatened action exists and no abuse of process is involved, there is no basis for a claim of duress. *Kaplan v. Kaplan,* 25 Ill.2d 181, 182 N.E.2d 706 (1962); see also *Allison v. Tucker,* 170 S.W.2d 963 (Mo. App.1943) (threats to sue and garnish

wages unless note executed were not "fraud" or "duress").

In spite of Plaintiff's status as a holder in due course, Debtor could properly raise the real defense of duress against the Consolidated Note to render it invalid. In pleading this affirmative defense, Debtor carries the burden of proof of establishing it. See *Bank of Kirksville v. Small,* 742 S.W.2d 127, 132 (Mo.banc 1987). Debtor has not met her burden as there is insufficient proof that LNB's actions at the time the Consolidated Note was executed were such as to deprive Debtor of her free will, or strip her of the quality of mind necessary to execute a valid contract. Debtor states in her Response that at the time the Consolidated Note was executed, her "extreme emotional distress" was only partly attributable to a series of business problems allegedly related to LNB's conduct. This statement, supported by others in the record made by Debtor, indicates that a substantial amount of her professed distress was traceable to souring business conditions and relationships that could in no way be fairly ascribed to LNB. This is not to say that LNB's conduct had little or no influence upon Debtor's decision to sign the note, but the Court finds that Debtor acted voluntarily with enough presence of mind to execute an enforceable promissory note. Debtor attempts in her pleadings to depict herself as a timid and unsuspecting individual. The totality of the record, however, reveals a woman of sufficient chutzpa and sophistication to be held accountable for her actions under the circumstances. In addition, although Debtor may not have had knowledge of all the facts surrounding the Corporation's financial affairs, she had opportunity for investigation, deliberation, and reflection prior to agreeing to execute the Consolidated Note. Further, the record is devoid of any evidence beyond Debtor's bare allegations that LNB did not possess the legal right to institute threatened actions against debtor's corporation or that

---

cient consideration of note. *Thompson v. McCune,* 63 S.W.2d 41, 43–44 (Mo.1933). There is sufficient contractual consideration if there is a showing of some benefit to the promisor. *Id.* For the reason previously stated, the Court need

not resolve the question of any benefit received, but merely notes these rules of law for the edification of the parties and similarly situated future litigants.

such actions would have constituted an abuse of legal process.

III. *Disputed Values of the Car and Residence*

Because neither party has requested he Court to make a determination as to the respective fair market values of the car and the Residence, the Court need not concern itself with this dispute.

## CONCLUSION

As a transferee downstream from the FDIC, which purchased Debtor's notes in its corporate capacity for value, in good faith, and without actual knowledge of any defenses, Plaintiff stands in the shoes of the FDIC as a statutory holder in due course within the purview of 11 U.S.C. § 1823(e). Debtor cannot, therefore, assert the personal defense of failure of consideration against the Consolidated Note. Although the real defense of duress is available to Debtor, there is insufficient evidence to support this claim. Since Debtor's defenses are unavailable or without merit, Plaintiff's title and interest in the notes are valid and enforceable. Plaintiff's request for relief from the automatic stay is, therefore, GRANTED.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law as required by Rule 7052, Rules of Bankruptcy.